U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 JUL 17 PM 4:56

CLERK
BY AL
DEPUTY CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

DAVID J. BLOCH,

*Plaintiff,*

v.

HEATHER BOUCHEY, in her official capacity as Interim Secretary of the Vermont Agency of Education,

JAY NICHOLS, in his official capacity as Executive Director of the Vermont Principals' Association,

WINDSOR CENTRAL SUPERVISORY UNION BOARD, and

SHERRY SOUSA, in her official and individual capacities as Superintendent of Windsor Central Supervisory Union,

*Defendants.*

Civil Action No.: 2:23-cv-209

**JURY TRIAL DEMANDED**

## VERIFIED COMPLAINT

Plaintiff David J. Bloch states:

## INTRODUCTION

1. Over a decade ago, Coach Bloch founded the snowboarding team at Woodstock Union High School. He has served as head coach for the entire life of the program.

2. Under his leadership, the program has had enormous success both on and off the slopes, including a number of individual state champions.

3. Coach Bloch is also a practicing Roman Catholic who believes that God creates males and females with immutable sex. His understanding of science complements his religious beliefs. Coach Bloch believes, based on scientific evidence, that there are only two sexes, which are male and female, and that sex is determined by a person's chromosomes.

4. But Coach Bloch's respectful expression of his beliefs contradicted the prevailing orthodoxy of the Defendant Vermont state officials, school district, and superintendent. So, Defendant Superintendent Sherry Sousa terminated him and barred him from future employment in the school district.

5. On February 8, 2023, Coach Bloch and his team were waiting in the lodge for a competition to start. That day, his team was to compete against a team that had a male snowboarder who identifies as a female and competes against females. During downtime in the lodge, Coach Bloch overheard a conversation between two of his athletes about that male competing against females.

6. Coach Bloch joined the conversation to offer that people express themselves differently and that there can be masculine women and feminine men.

7. But he affirmed that as a matter of biology, males and females have different DNA, which causes males to develop differently from females and have different physical characteristics. Coach Bloch discussed that biological differences generally give males competitive advantages in athletic events.

8. The conversation was respectful among all parties and lasted no more than three minutes. It took place entirely outside the presence of the transgender-identifying snowboarder.

9. Coach Bloch's team and the team with the male who identifies as a female competed without incident. After the competition, the two teams and their coaches, including Coach Bloch, shared a bus home.

10. The very next day, Defendant Sousa summoned Coach Bloch to her office. She handed him a notice of termination, while admitting that the investigation into Coach Bloch's conversation was not complete.

11. The notice accused Coach Bloch of violating Defendant Windsor Central Supervisory Union Board's Harassment, Hazing, and Bullying (HHB) policy and the Vermont Principals' Association (VPA) related policy for "ma[king] reference to [a] student in a manner that questioned the legitimacy and appropriateness of the student competing on the girls' team to members of the WUHS snowboard team"—all outside the student's presence.

12. Defendant Windsor Central Supervisory Union Board adopted its HHB policy and procedures substantively verbatim from the model HHB policy and procedures issued by Defendant Vermont Secretary of Education Heather Bouchey pursuant to a Vermont statute requiring school districts to adopt such a policy. *See* Vt. Stat. Ann. tit. 16, § 570(b). Likewise, the VPA adopted the same statutory prohibition of "harassment." The statute and policies all contain content and viewpoint discriminatory, overbroad, and unconstitutionally vague definitions of harassment that Defendants can use—and have used, in this case—to censor protected speech.

13. Coach Bloch now brings this suit to redress Defendants' unlawful retaliation and enjoin their unconstitutional law and policies.

## JURISDICTION & VENUE

14. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

15. This Court has subject-matter jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

16. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343, the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02, the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65, and costs and attorney's fees under 42 U.S.C. § 1988.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged in the Complaint occurred in this district.

## THE PARTIES

18. Plaintiff David J. Bloch resides in Windsor County, Vermont.

19. Defendant Heather Bouchey is the interim Secretary of the Vermont Agency of Education.

20. As Secretary of Education, Defendant Bouchey "shall . . . [s]upervise and direct the execution of the laws relating to the public schools and ensure compliance." Vt. Stat. Ann. tit. 16, § 212(5).

21. As Secretary of Education, Defendant Bouchey "shall . . . [s]upervise the expenditure and distribution of all money appropriated by the State . . . for public schools." Vt. Stat. Ann. tit. 16, § 212(6).

22. As Secretary of Education, Defendant Bouchey can withhold funding from school districts that violate Vermont law.

23. As Secretary of Education, Defendant Bouchey has the responsibility as set by statute for the creation and revision of model HHB policies. Vt. Stat. Ann. tit. 16, § 570(d)(1).

24. As Secretary of Education, Defendant Bouchey is responsible for ensuring that all school districts in Vermont, including the Windsor Central Supervisory Union, comply with her model HHB policies.

25. Defendant Bouchey has not taken any steps to repeal or revise her model HHB policies or otherwise bring them into compliance with constitutional requirements.

26. Defendant Bouchey is sued in her official capacity only.

27. Defendant Jay Nichols is the Executive Director of the Vermont Principals' Association.

28. As Executive Director, Defendant Nichols is "the chief executive officer" of the Vermont Principals' Association and has "the powers, duties and responsibilities usually associated with the office." Ex. 1 at 3, VPA Bylaws art. 6, § 1. A true, accurate, and complete copy of the Vermont Principals' Association bylaws is Exhibit 1.

29. One of Defendant Nichols's powers, duties, and responsibilities is enforcing VPA policies, including its harassment policy.

30. Defendant Nichols is sued in his official capacity only.

31. The VPA is an association of Vermont schools and school leaders that oversees sports and other activities in Vermont for its 270 member schools.

32. The VPA is a state actor.

33. The VPA includes all public high schools in Vermont, acts through the public schools' representatives, draws its officers from them, is predominantly funded by their dues and income received in their stead, and has historically been seen to regulate in lieu of the Agency of Education's exercise of its own authority.

34. The VPA currently oversees 28 sports and activities in Vermont.

35. The VPA controls scheduling, participation in, and the policies governing VPA sport competitions.

36. School-members of the VPA must abide by its policies to continue to be members and to compete in VPA sports competitions.

37. If VPA member schools do not abide by VPA policies, the VPA will prevent them from competing in VPA events.

38. All public high schools in Vermont are members of the VPA.

39. Over 95% of the VPA's member schools are public schools.

40. The VPA member schools, including its public-school members, are represented in the VPA by the principal or a designee of the principal of each school. Ex. 1 at 1, VPA Bylaws art. III, § 1. The principal or designee that represents each school is "entitled to vote for that school on activity matters and also to serve on committees related to activities." *Id.*

41. The VPA has a 15-member Executive Council that serves as its "governing body." Ex. 1 at 4, VPA Bylaws art. VI, § 3.

42. The members of the VPA, including its public-school members, select the members of the Executive Council, including the VPA's President and President-elect. *Id.*

43. Twelve out the thirteen current members of the Executive Council (92%), including the VPA's President and President-elect, are principals, former principals, or other senior administrators of public schools. Ex. 2 at 2. A true, accurate, and complete copy of the current members of the VPA's Executive Council is Exhibit 2.

44. VPA policies are established by the VPA's members, including its public-school members.

45. The VPA Executive Council has "the authority to appoint any necessary committees and delegate responsibilities to those committees," including the VPA's Activity Standards Committee. Ex. 1 at 4, VPA Bylaws art. VI, § 3.

46. The VPA's Activity Standards Committee votes on "[a]ll policies governing student activities . . . subject to the approval by the Executive Council." Ex. 1 at 6, VPA Bylaws art. VII, § 2.

47. The VPA's Executive Council appoints nine of the 11 members to the Activity Standards Committee. Ex. 3 at 1. Those nine members must be VPA members. *Id.* A true, accurate, and complete copy of the rules governing the Activity Standards Committee is Exhibit 3.

48. Over 80% of the VPA's annual revenue ($1,590,109) comes from membership dues from its predominately public-school members ($413,821), admissions to and sales at VPA-regulated sports and activities, and conferences and other programs for the VPA's members ($865,704, collectively). Ex. 4 at 9. A true, accurate, and complete copy of VPA's 2021 Form 990 is Exhibit 4.

49. In charging for admissions, the VPA exercises the authority of its predominantly public-school members to charge for admission to their games; the VPA does not receive this money from the schools, but rather collects the money as its own.

50. The VPA works hand-in-hand with the Vermont Agency of Education in various ways, including the following:

a. The state-mandated "Advisory Council to review and coordinate school and statewide activities relating to the prevention of and response to harassment, hazing, and bullying" established by Defendant Secretary must include "the Executive Director of the Vermont Principals' Association or designee." Vt. Stat. Ann. tit. 16, § 570(d)(2).

b. A goal of the VPA's Executive Council is to "[c]ollaborate with [the Vermont Agency of Education] to support Principals." Ex. 5 at 1. A true, accurate, and complete copy of the VPA Executive Council's goals is Exhibit 5.

c. The Vermont Agency of Education's *Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming*

*Students* states that "[p]articipation in competitive athletic activities and sports will be resolved on a case-by-case basis" and that "[s]chools should refer to the Vermont Principal's Association Activities/Athletics Policies: Article 1 Section 2." Ex. 6 at 6. A true, accurate, and complete copy of the *Continuing Best Practices* is Exhibit 6.

51. The Vermont Legislature has delegated important educational functions and duties to the VPA:

a. Vermont law requires Defendant Secretary to include Defendant VPA Executive Director on the state-created Advisory Council for the prevention of and response to harassment, hazing, and bullying. *See* Vt. Stat. Ann. tit. 16, § 570(d)(2).

b. "When a school district hires a principal or a career technical center director who has not been employed previously in that capacity, the superintendent serving the district, *in consultation with the Vermont Principals' Association*, shall work to ensure that the new principal or career technical center director receives mentoring supports during at least the first two years of employment. Mentoring supports shall be consistent with best practices, research-based approaches, or other successful models, and *shall be identified jointly by the Vermont Principals' Association* . . . ." Vt. Stat. Ann. tit. 16, § 245(a) (emphasis added).

c. "The Secretary of Education or designee, *assisted by members of the Vermont Principals' Association selected by that association*, . . . shall develop statewide guidelines, forms, and other materials, and update them when necessary, that are designed to educate coaches, youth athletes, and the parents and

guardians of youth athletes regarding [concussions]." Vt. Stat. Ann. tit. 16, § 1431(b) (emphasis added).

d. "Prior to appointing a member [of the Vermont Standards Board for Professional Educators], the Governor shall consult with the State Board of Education and, as appropriate, . . . *the Vermont Principals Association* . . . ." Vt. Stat. Ann. tit. 16, § 1693(b) (emphasis added).

52. Defendant Windsor Central Supervisory Union Board is and was at all relevant times the body governing schools within Windsor Central Supervisory Union, and its headquarters are located in Windsor County, Vermont.

53. Defendant Board is a supervisory union board of directors. *See* Vt. Stat. Ann. tit. 16, § 261a.

54. Defendant Board has authority to enact policies governing administration of schools within the school district, which include the policies challenged here, to supervise and direct the actions of the Defendant Superintendent and school administrators, including the actions taken against Plaintiff, and to exercise ultimate supervisory authority over all school district personnel, including the power to hire, suspend, and terminate coaches.

55. Woodstock Union High School is part of the Windsor Central Supervisory Union.

56. Woodstock Union High School is a member of the VPA.

57. Defendant Sherry Sousa is and was at all relevant times the Superintendent of Windsor Central Supervisory Union.

58. As superintendent, Defendant Sousa is the "chief executive officer" of Windsor Central Supervisory Union. Vt. Stat. Ann. tit. 16, § 11(a)(13).

59. Defendant Board has delegated to Defendant Sousa the power and responsibility to "manage[ ] all operations of the school system in accordance with

board policies." Ex. 7 at 1. A true, accurate, and complete copy of Windsor Central Supervisory Union Policy A24 Board/Superintendent Relationship is Exhibit 7.

60. Defendant Superintendent "is accountable to [Defendant] [B]oard for the performance of staff." *Id.*

61. Defendant Board has delegated its supervisory authority over coaches, including the power to hire, suspend, and terminate coaches, to Defendant Sousa.

62. Defendant Sousa is responsible for enforcing Defendant Board's policies, including its HHB policy and procedure.

63. Defendant Sousa is sued in her official and individual capacities.

64. At all times relevant to this Complaint, and for each act or omission alleged herein, Defendants were acting under color of a statute, regulation, or custom of the State of Vermont (*i.e.*, under color of state law and authority).

## FACTUAL ALLEGATIONS

### A. Coach Bloch and his beliefs

65. Coach Bloch is a practicing Roman Catholic.

66. Coach Bloch's faith teaches him that God immutably creates each person as male or female; these two distinct, complementary sexes reflect the image of God; and rejection of one's biological sex is a rejection of the image of God within that person.

67. Coach Bloch's faith also instructs that all people are children of God with inherent dignity and should be treated with love and respect.

68. Coach Bloch therefore strives to treat all people with love and respect.

69. Coach Bloch believes, based on scientific evidence, that there are only two sexes, which are male and female, and that sex is determined by a person's chromosomes.

70. Coach Bloch believes, based on scientific evidence, that no one can change his or her sex.

71. Coach Bloch understands, based on scientific evidence and his own experience as a coach, that children do not have a fully developed capacity to understand the long-term consequences of their decisions.

72. Coach Bloch wants the best for all of his athletes and wishes to refrain from doing anything that would be harmful to them or would create an unreasonable risk of harm to them.

**B. Coach Bloch founded the school's snowboarding program and has led it to enormous success.**

73. In 2011, Coach Bloch founded the snowboarding program at Woodstock Union High School.

74. The team consists of high school students.

75. He has served as head coach for the entire life of the program.

76. During the first three years of the program, he coached as a volunteer to help start the team and provide an activity that developed athletic, social, and teamwork skills and self-esteem for high school students.

77. Over the years, Coach Bloch has led the program to enormous success in terms of both athletic accomplishment and personal growth of the snowboarders.

78. The program has consistently won top three placements statewide with at least three individual state champions.

79. Over the years, he has noticed extraordinary personal growth in the student-snowboarders he coaches.

80. Coach Bloch keeps in contact with approximately a dozen alumni of the snowboarding team.

81. Many snowboarders join the team reluctantly at the behest of their parents to become more involved but over the course of the season become more motivated to work on their physical fitness and academic progress.

82. Each year since 2011, Defendant Board and its superintendent have renewed Coach Bloch's contract to coach. *See* Ex. 8 at 9–20. Exhibit 8 is a true, accurate, and complete redacted copy of Coach Bloch's personnel file issued by Windsor Central Supervisory Union.

83. Under the contract for the 2022–23 season, Defendants agreed to pay Coach Bloch $4,439. Ex. 8 at 9.

84. That contract identifies six "[p]erformance [r]esponsibilities":

a. Coaching "the skills necessary for excellent achievement in the sport";

b. Planning and scheduling practice;

c. Working with the athletic director in scheduling interscholastic events;

d. Recommending purchase of appropriate equipment, supplies, and uniforms;

e. Maintaining necessary attendance forms, insurance records, and similar paperwork; and

f. Overseeing safety conditions when the team is snowboarding. *Id.*

85. Coach Bloch has never received a complaint about his coaching.

86. Coach Bloch has never discriminated against or harassed any student, athlete, coach, or school district employee.

87. Coach Bloch has never received discipline from the school district (until the events as alleged in this Complaint).

88. Coach Bloch's personnel file has no record of discipline, reprimand, or complaints. *See* Ex. 8.

89. While working within the school district, Coach Bloch has had respectful interactions and relationships with all of his colleagues.

90. While working within the school district, Coach Bloch has had only respectful interactions with the students he coaches and supervises and their parents.

91. The high school's snowboarding team competes in the snowboarding league governed and controlled by the VPA.

**C. Coach Bloch and his athletes discuss a male snowboarder competing against females.**

92. On February 8, 2023, Coach Bloch and his team were waiting in the lodge for a competition to start. No other teams or other snowboarders were present in the area of the lodge where the team was waiting.

93. That day, Coach Bloch's team was to compete against a team from another school district that had a male snowboarder who identifies as a female and competes in the female division.

94. During the downtime before the competition, the coaches and players were free to do homework or other work, communicate with family or friends, play on their phones, or chat among themselves.

95. Coach Bloch was sitting at a table with two of his snowboarders, Student 1 (a male) and Student 2 (a female) who had engaged in a conversation about transgender-identifying athletes competing in sports.

96. The conversation itself was not disruptive nor did it appear to have a risk of becoming disruptive.

97. Student 1 expressed his opinion that males competing against females was unfair based on differences in biology.

98. Student 2 responded by accusing Student 1 of being transphobic.

99. At that point, Coach Bloch joined the conversation.

100. Coach Bloch recognized that people express themselves in different ways and that there can be masculine women and feminine men.

101. Coach Bloch also asserted that as a matter of biology, males and females have different DNA.

102. Coach Bloch said that those differences in DNA cause males to develop differently from females and to have different physical characteristics. To illustrate this concept, Coach Bloch gave the example that an archaeologist digging up bones would categorize them as belonging either to a male or female because of the inherent differences between males and females.

103. Coach Bloch discussed that different physical characteristics generally give males competitive advantages in athletic competitions.

104. At no point in the conversation did Coach Bloch refer to the transgender-identifying snowboarder.

105. The conversation was respectful among all three parties.

106. The conversation lasted less than three minutes.

107. No other people were present during the conversation.

108. Despite disagreeing with Coach Bloch's views on the appropriateness of males who identify as females competing against females, Student 2 thanked him for a "good conversation."

109. Coach Bloch's conversation with Students 1 and 2 did not interfere with his duties as a snowboarding coach or any other duties as a Windsor Central Supervisory Union employee.

110. After the conversation, Coach Bloch's team competed without incident.

111. After the competition, Coach Bloch and his team shared a bus home with the team with the male who identifies as a female, who was also on the bus.

112. There was no tension on the bus, and Coach Bloch had no further discussion regarding the appropriateness of males competing against females.

113. Coach Bloch does not have any snowboarders who identify as transgender on his team.

114. Coach Bloch does not have any policymaking or discretionary role within the school district and serves the district only as a snowboarding coach.

**D. Defendant Sousa terminates Coach Bloch under Defendants' HHB policies and procedures for speaking in accord with sex.**

115. On February 9, the school's athletic director Jack Boymer told Coach Bloch he had received a complaint about the February 8 conversation.

116. Coach Bloch informed Mr. Boymer that he had discussed biological differences between males and females with Students 1 and 2.

117. That same day around 3 pm, Coach Bloch met with Defendant Sousa.

118. Defendant Sousa began the meeting by handing Coach Bloch a notice of his "immediate termination" for purportedly violating Defendant Board's Prevention of Hazing, Harassment, and Bullying Policy and "the Vermont Principals' Association Athletics Policy." Ex. 8 at 2–3. A true, accurate, and complete copy of that notice is contained in Coach Bloch's personnel file.

119. The notice stated that Coach Bloch "made reference to [a] student in a manner that questioned the legitimacy and appropriateness of the student competing on the girls' team to members of the WUHS snowboard team." Ex. 8 at 2.

120. Defendant Sousa's notice claimed that "administrators investigated" and their "findings confirmed that [Coach Bloch's] actions violated the policy." *Id.*

121. Defendant Sousa found that Coach Bloch's purported "use of disparaging names created an objectively offensive environment and constituted harassment based on gender identity, justifying terminati[on]." *Id.*

122. Defendant Sousa also barred Coach Bloch from "consider[ation] for any future coaching positions within" the school district. *Id.*

123. Upon information and belief, Defendant Board knew of Defendant Sousa's termination of Coach Bloch and ratified that termination.

124. After handing Coach Bloch the notice of his termination, Defendant Sousa told him that the investigation into his February 8 conversation was not complete.

125. Defendant Sousa told Coach Bloch she did not have all the details of Coach Bloch's speech on February 8.

126. Defendant Sousa informed Coach Bloch that he would receive the investigative report the day after their meeting.

127. Defendant Sousa remained visibly angry throughout the meeting with Coach Bloch.

128. Upon information and belief, Defendant Sousa has a child who identifies as transgender.

129. Coach Bloch has never received the investigative report, despite asking school district officials for it repeatedly.

130. Prior to terminating Coach Bloch, Defendants Board and Sousa never informed him of the allegations against him, of any investigation into those allegations, of their HHB policy and procedures, or of his confidentiality rights.

131. Prior to terminating Coach Bloch, Defendants Board and Sousa did not provide any notice to Coach Bloch.

132. After terminating Coach Bloch, Defendants never informed him of his right to appeal their termination decision.

133. Defendants Board and Sousa never gave Coach Bloch the opportunity to present witnesses and evidence during the investigation.

134. Defendants terminated Coach Bloch with 3 weeks remaining in the season.

135. If Defendants had not terminated Coach Bloch, his contract to coach snowboarding would have been automatically renewed for the 2023–24 season.

136. Defendants had automatically renewed Coach Bloch's contract for the past ten seasons.

137. When renewing his contract, Coach Bloch did not have to apply to be the coach, attend interviews, or otherwise undergo a hiring process.

138. A contract to coach for the 2023–24 season would be signed no later than early December 2023.

139. Coach Bloch wishes to coach the snowboarding team for the 2023–24 season.

**E. Defendants' unconstitutional HHB laws, policies, and procedures.**

140. In 2012, Vermont enacted a law requiring Defendant Secretary of Education to develop and school districts to adopt a policy on harassment, hazing, and bullying. *See* Vt. Stat. Ann. tit. 16, § 570.

141. The law requires every "school board" to "develop, adopt, ensure the enforcement of, and make available . . . harassment, hazing, and bullying prevention policies that shall be at least as stringent as model policies developed by the Secretary." Vt. Stat. Ann. tit. 16, § 570(b).

142. A "school board" includes a "supervisory union board of directors," of which Defendant Board is one. Vt. Stat. Ann. tit. 16, § 11(a)(9).

143. The statute charges Defendant Secretary with "develop[ing] and, from time to time, updat[ing] model harassment, hazing, and bullying prevention policies." Vt. Stat. Ann. tit. 16, § 570(d)(1).

144. The statute sets forth various requirements for policies, *see* Vt. Stat. Ann. tit. 16, § 570a, and "prohibit[s]" harassment, which it defines as including

> "an incident or incidents of verbal, written, visual, or physical conduct . . . based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status, sex, sexual orientation, gender identity, or disability that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a

> student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment." *Id.* § 11(a)(26)(A).

145. The statutory definition of "harassment" also

> "includes conduct that violates subdivision (A) of this subdivision (26) and constitutes . . . conduct directed at the characteristics of a student's or a student's family member's actual or perceived creed, national origin, marital status, sex, sexual orientation, gender identity, or disability and includes the use of epithets, stereotypes, slurs, comments, insults, derogatory remarks, gestures, threats, graffiti, display, or circulation of written or visual material, taunts on manner of speech, and negative references to customs related to any of these protected categories." *Id.* § 11(a)(26)(B).

146. The statute allows a private right of action for a claim "brought under the Fair Housing and Public Accommodations Act" for "unlawful harassment." Vt. Stat. Ann. tit. 16, § 570f(b); Vt. Stat. Ann. tit. 16, § 570f(c) (citing Vt. Stat. Ann. tit. 9, § 4502).

147. Defendant Secretary has adopted a model policy and model procedures implementing that policy. A true, accurate, and complete copy of the current version of the model policy taken from Defendant Secretary's website (https://education.vermont.gov/documents/healthy-safe-schools-hhb-model-policy) is Exhibit 9. A true, accurate, and complete copy of the current version of the model procedures taken from Defendant Secretary's website (https://education.vermont.gov/documents/healthy-safe-schools-hhb-model-procedures) is Exhibit 10.

148. Defendant Secretary's model policy adopts the statutory definition of "harassment" in full. *Compare* Vt. Stat. Ann. tit. 16, § 11(a)(26), *with* Ex. 9 at 3–4.

149. Defendant Board adopted the model policy and procedure's substantive provisions almost verbatim. A true, accurate, and complete copy of Defendant Board's C10, Prevention of Harassment, Hazing, and Bullying Policy and C10P, Prevention of Harassment, Hazing, and Bullying Procedures is Exhibit 11.

150. Vermont law requires HHB policies to include "[c]onsequences and appropriate remedial action for staff or students who commit harassment." Vt. Stat. Ann. tit. 16, § 570a(a)(2).

151. Both Defendant Secretary's model HHB policy and Defendant Board's HHB policy require the school district, in response to "substantiated complaints" of harassment, to "take prompt and appropriate remedial action reasonably calculated to stop the hazing, harassment and/or bullying; prevent its recurrence; and to remedy the impact of the offending conduct on the victim(s), where appropriate." Ex. 9 at 2; Ex. 11 at 1.

152. Under both policies "appropriate remedial action" includes "a wide range of responses from education to serious discipline," and "[s]erious discipline may include termination for employees." Ex. 9 at 2; Ex. 11 at 1–2.

153. Under Defendant Secretary's model procedures and Defendant Board's procedures, "[w]hether a particular action constitutes a violation of this policy requires determination based on all the facts and surrounding circumstances." Ex. 10 at 4; Ex. 11 at 7.

154. Defendant Board's HHB procedures require it to "initiate or cause to be initiated, an investigation of the allegations" of harassment no later than one school day after receiving notice of those allegations. Ex. 11 at 6.

155. When it begins an investigation into alleged harassment, Defendant Board's HHB procedures require it to "notify in writing" the "accused individual" that an investigation has been initiated; retaliation is prohibited; all parties have certain confidentiality rights; and the parties will be informed in writing of the outcome of the investigation. *Id.*

156. During an investigation, Defendant Board's HHB procedures require it to "provide[ ] the opportunity to present witnesses and other evidence" to the parties. Ex. 11 at 7.

157. Defendant Board's HHB procedures require its investigator "[n]o later than five school days" from receiving a complaint alleging harassment to "submit a written initial determination to the school administrator." *Id.*

158. At the conclusion of the investigation, Defendant Board's HHB procedures require it to notify the accused person "in writing of [his] right to appeal" the finding. Ex. 11 at 8.

159. As part of an appeal, Defendant Board's HHB procedures require it to "make available upon request of the Accused Student/Appellant, any relevant information, documents, materials, etc. related to the investigation and related finding on appeal." Ex. 11 at 11.

160. The VPA has adopted the statutory definition of harassment in Vt. Stat. Ann. tit. 16, § 11(a)(26).

161. The VPA's policies cite the Vermont Public Accommodations Act. Ex. 12 at 4 (citing Vt. Stat. Ann. tit. 9, § 4502). A true, accurate, and complete copy of Vermont Principals' Association Athletic Policies is Exhibit 12.

162. The VPA's "policies prohibit discrimination and/or harassment of students on school property or at school functions by students or employees." *Id.*

163. The VPA's policies note that the "prohibition against discrimination includes discrimination based on a student's actual or perceived sex and gender. Gender includes a person's actual or perceived sex as well as gender identity and expression." *Id.*

164. The Vermont law defining prohibited harassment, Defendant Secretary's model HHB policies and procedures, Defendant Board's HHB policy and procedures, and the VPA's policy prohibiting harassment enforced by Defendant Nichols are collectively referred to as "Defendants' HHB law, policies, and procedures."

165. Defendants' actions and HHB law, policies, and procedures caused injury to Coach Bloch, including deprivation of constitutional rights, loss of income, loss of reputation, and pain, suffering, and emotional distress.

166. If reinstated, Coach Bloch intends to continue to express his beliefs regarding the immutability of sex.

167. Defendants' HHB laws, policies, and procedures prohibit Coach Bloch's speech, as shown by Defendant Sousa's termination of him.

168. Defendants' termination of Coach Bloch has caused school district employees to refrain from expressing their opinions regarding the immutability of sex and the appropriateness of a teenage male competing against teenage females in an athletic competition.

169. A number of school district employees agree with Coach Bloch's views, but they are too afraid to express them for fear of suffering termination, as Coach Bloch has suffered.

170. Those school district employees fear that expressing views like Coach Bloch's publicly will cause them to incur discipline from Defendants.

**FIRST CAUSE OF ACTION**
**Violation of the First Amendment: retaliation (42 U.S.C. § 1983)**

171. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 170 of this Complaint.

172. Coach Bloch has rights under the First and Fourteenth Amendments to the United States Constitution to express his views on differences in sex and the appropriateness of a teenage male competing against teenage females in an athletic competition, and in so doing to refer to a male as a male.

173. By expressing such views, Coach Bloch was engaged in constitutionally protected activity.

174. Defendants took adverse action against Coach Bloch by terminating him from his position as coach of the snowboarding team and barring him from future employment in the school district.

175. Defendants' adverse actions against Coach Bloch were motivated and substantially caused by the exercise of his right to engage in constitutionally protected activity, including the right to express views on differences in sex and the appropriateness of a teenage male competing against teenage females in an athletic competition, and in so doing to refer to a male as a male.

176. Defendants would not have taken adverse action against Coach Bloch absent his expression of these constitutionally protected views.

177. By taking adverse action against Coach Bloch for expressing his views, Defendants unlawfully retaliated against him for exercising his constitutional right to free speech.

178. Defendants' adverse actions against Coach Bloch were sufficient to deter a person of ordinary firmness from exercising his constitutional rights and thus effectively chilled the exercise of Coach Bloch's constitutional rights.

179. Coach Bloch spoke as a private citizen on a matter of public concern.

180. Coach Bloch did not speak pursuant to government policy and did not convey a government-created message.

181. Coach Bloch was not instructing players, discussing strategy, encouraging better on-field performance, or engaging in any other speech as an employee.

182. Coach Bloch spoke with Students 1 and 2 before a competition and during a period in which coaches and players were free to attend to personal matters, such as doing homework or other work, communicating with family or friends, playing on their phones, or chatting among themselves.

183. Coach Bloch's expression of his views on differences in sex and the appropriateness of a teenage male competing against teenage females in an athletic competition, and in so doing to refer to a male as a male, has not prevented Defendants from efficiently providing services to the public (or even threatened to).

184. Coach Bloch's interest in expressing his views on differences in sex and the appropriateness of a teenage male competing against teenage females in an athletic competition, and in so doing to refer to a male as a male, outweighs any interest of Defendants in suppressing those views.

## SECOND CAUSE OF ACTION
## Violation of the First Amendment: content and viewpoint discrimination
## (42 U.S.C. § 1983)

185. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 170 of this Complaint.

186. The First Amendment's Free Speech Clause prohibits discrimination against speech based on its content and viewpoint.

187. Defendants' HHB law, policies, and procedures discriminate based on the content and viewpoint of speech.

188. Defendants' definition of "harassment" draws facial distinctions by defining regulated speech by subject matter and viewpoint—that is, speech about "a student's or a student's family member's actual or perceived" protected categories: race, creed, national origin, marital status, disability, sex, sexual orientation, gender identity, or gender expression. Vt. Stat. Ann. tit. 16, § 11(a)(26); Ex. 9 at 3–4; Ex. 11 at 2.

189. Defendants' definition of "harassment" includes "epithets, stereotypes, slurs, . . . insults, derogatory remarks, . . . and negative references to customs," which also draw facial distinctions regulating speech by subject matter and viewpoint. Vt. Stat. Ann. tit. 16, § 11(a)(26)(B); Ex. 9 at 4; Ex. 11 at 3.

190. The Free Speech Clause's prohibition against content- and viewpoint-based discrimination not only demands that state actors refrain from that discrimination, but also requires the government to limit the discretion of its officials through narrow, objective, and definite standards to protect against content- and viewpoint-based discrimination.

191. Defendants' definition of "harassment" contains no guidelines sufficient to prevent government officials, including Defendants, from exercising unbridled discretion to target speech whose content and viewpoints they disagree with.

192. Defendants' definition of "harassment" uses the open-ended prefatory phrase "includes." Vt. Stat. Ann. tit. 16, § 11(a)(26)(B); Ex. 9 at 4; Ex. 11 at 3.

193. Defendants' definition of "harassment" "includes the use of epithets, stereotypes, slurs, comments, insults, derogatory remarks, gestures, threats, graffiti, display, or circulation of written or visual material, taunts on manner of speech, and negative references to customs related to any of the[ ] protected categories." Vt. Stat. Ann. tit. 16, § 11(a)(26)(B); Ex. 9 at 4; Ex. 11 at 3.

194. Defendants' definition thus grants government officials unbridled discretion to target disfavored speech that they label as "epithets, stereotypes, slurs, comments, insults, derogatory remarks, gestures, threats, graffiti, . . . and negative references." Vt. Stat. Ann. tit. 16, § 11(a)(26)(B); Ex. 9 at 4; Ex. 11 at 3.

195. Defendants' HHB law, policies, and procedures violate the First Amendment because they fail to limit the definition of "harassment" to conduct that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.

196. Defendants' HHB law, policies, and procedures neither support a compelling government interest nor are narrowly tailored to any such interest.

197. Defendants' HHB law, policies, and procedures discriminate based on the content and viewpoint of speech made by employees as private citizens about

matters of public concern.

198. Defendants have no interest that would outweigh the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression.

199. Defendants' HHB law, policies, and procedures violate both facially and as applied the Free Speech Clause of the First Amendment.

**THIRD CAUSE OF ACTION**
**Violation of the First Amendment: prior restraint (42 U.S.C. § 1983)**

200. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 170 of this Complaint.

201. The First Amendment's Free Speech Clause prohibits prior restraints.

202. Threatening to censor future speech is a prior restraint.

203. Defendants' HHB law, policies, and procedures threaten future speech.

204. Defendants' HHB law, policies and procedures "prohibit" "harassment." Vt. Stat. Ann. tit. 16, § 570a(a)(1); Ex. 9 at 1; Ex. 11 at 1; Ex. 12 at 4.

205. Defendants' definition of "harassment" uses the open-ended prefatory phrase "includes." Vt. Stat. Ann. tit. 16, § 11(a)(26)(B); Ex. 9 at 4; Ex. 11 at 3.

206. Defendants' definition of "harassment" "includes" a single "incident" of "verbal" conduct. Vt. Stat. Ann. tit. 16, § 11(a)(26)(A); Ex. 9 at 3–4; Ex. 11 at 2–3.

207. Defendants' definition of "harassment" "includes the use of epithets, stereotypes, slurs, comments, insults, derogatory remarks, gestures, threats, graffiti, display, or circulation of written or visual material, taunts on manner of speech, and negative references to customs related to any of the[ ] protected categories." Vt. Stat. Ann. tit. 16, § 11(a)(26)(B); Ex. 9 at 4; Ex. 11 at 3.

208. Defendants' HHB law, policies, and procedures violate the First Amendment because they fail to limit the definition of "harassment" to conduct that is so severe, pervasive, and objectively offensive that it effectively bars the victim's

access to an educational opportunity or benefit.

209. Defendants' HHB law, policies, and procedures neither support a compelling government interest nor are narrowly tailored to any such interest.

210. Defendants' HHB law, policies, and procedures impose a prior restraint on speech made by employees as private citizens about matters of public concern.

211. Defendants have no interest that would outweigh the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression.

212. Defendants' HHB law, policies, and procedures violate both facially and as applied the Free Speech Clause of the First Amendment.

## FOURTH CAUSE OF ACTION
## Violation of the First Amendment: unconstitutional overbreadth (42 U.S.C. § 1983)

213. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 170 of this Complaint.

214. Defendants' HHB law, policies, and procedures violate the First Amendment's Free Speech Clause because they are facially overbroad.

215. Defendants' definition of "harassment" reaches a substantial amount of constitutionally protected speech in relation to any plainly legitimate sweep.

216. Defendants' definition of "harassment" uses the open-ended prefatory phrase "includes." Vt. Stat. Ann. tit. 16, § 11(a)(26)(B); Ex. 9 at 4; Ex. 11 at 3.

217. By defining "harassment" to include a single "incident" of "verbal" conduct motivated by any of numerous characteristics, including "gender identity," that has the effect of creating an "offensive environment," among other things, Defendants can punish a substantial amount of constitutionally protected speech. Vt. Stat. Ann. tit. 16, § 11(a)(26)(A); Ex. 9 at 3–4; Ex. 11 at 2–3.

218. By defining "harassment" to mean "conduct directed at the

characteristics of a student's . . . gender identity," including "comments," "epithets," and "derogatory remarks," Defendants can punish a substantial amount of constitutionally protected speech. Vt. Stat. Ann. tit. 16, § 11(a)(26)(B); Ex. 9 at 3–4; Ex. 11 at 2–3.

219. By defining "harassment" to include "conduct . . . that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment," Defendants can punish a substantial amount of constitutionally protected speech. Vt. Stat. Ann. tit. 16, § 11(a)(26)(A); Ex. 9 at 3–4; Ex. 11 at 2–3.

220. Defendants' HHB law, policies, and procedures violate the First Amendment because they fail to limit the definition of "harassment" to conduct that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.

221. Defendants' HHB law, policies, and procedures impose an overbroad restraint on speech made by employees as private citizens about matters of public concern.

222. Defendants have no interest that would outweigh the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression

223. The overbreadth of Defendants' HHB law, policies, and procedures chills Coach Bloch and other employee's speech.

## FIFTH CAUSE OF ACTION
## Violation of Fourteenth Amendment: procedural due process and void for vagueness (42 U.S.C. § 1983)

224. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 170 of this Complaint.

225. The Due Process Clause of the Fourteenth Amendment at a minimum prohibits government from terminating public employees without giving them notice of the allegations against them and an opportunity to be heard before an impartial tribunal.

226. Defendants Sousa and Board did not give Coach Bloch notice of the allegations against him or the opportunity to be heard before an impartial tribunal before terminating him.

227. Defendants Sosua and Board did not give Coach Bloch the opportunity to be heard before an impartial tribunal after terminating him.

228. By disciplining him under vague law, policies, and procedures, Defendants also violated Coach Bloch's right to due process of law under the Fourteenth Amendment to the United States Constitution.

229. Coach Bloch's views on differences in sex and the appropriateness of a teenage male competing against teenage females in an athletic competition, and in so doing to refer to a male as a male, are protected by the First and Fourteenth Amendments to the United States Constitution.

230. Defendants' HHB law, policies, and procedures are unconstitutionally vague because they grant government officials unbridled discretion in deciding what constitutes "gender identity," "harassment," and "harassment on the basis of gender identity," because they utilize terms that are inherently subjective and elude any precise or objective definition that would be consistent from one administrator, teacher, or student to another, because they are incapable of providing meaningful guidance to Defendants and other government officials, and because they force coaches and other employees to guess whether expression that the United States Constitution protects is in fact allowed.

231. Defendants' HHB law, policies, and procedures fail to provide a person of ordinary intelligence fair notice of what is prohibited and are so standardless that

they authorize discriminatory enforcement.

232. The lack of objective criteria, factors, or standards in Defendants' HHB law, policies, and procedures renders these law, policies, and procedures unconstitutionally vague and in violation of Coach Bloch's right to due process of law under the United States Constitution.

233. Defendants' HHB law, policies, and procedures both facially and as applied violate the Due Process Clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

Wherefore, Plaintiff David J. Bloch asks this Court to enter judgment against Defendants and provide the following relief:

A. A declaratory judgment that Defendants' termination of his employment as snowboarding coach violated his clearly established rights protected by the First and Fourteenth Amendments to the United States Constitution;

B. A declaratory judgment that Defendants' HHB law, policies, and procedures on their face and as applied to Coach Bloch violate the First and Fourteenth Amendments to the United States Constitution;

C. A preliminary and permanent injunction ordering Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf to:

i. Reinstate Coach Bloch as snowboarding coach;

ii. Refrain from enforcing their ban on considering Coach Bloch "for any future coaching positions";

iii. Refrain from taking further action against Coach Bloch for having expressed his views on differences in sex and the appropriateness of a teenage male competing against teenage females in an athletic competition, and in so doing to refer to a male as a male;

iii. Refrain from taking any action against Coach Bloch for having initiated this action; and

iv. Purge from any records in their possession, custody, or control any reference to Coach Bloch's termination as snowboarding coach;

D. A preliminary and permanent injunction preventing Defendants from enforcing their HHB law, policies, and procedures to prohibit:

i. "harassment" that is not so severe, pervasive, and objectively offensive that it effectively bars a student's access to an educational benefit; and

ii. expressing views on differences in and the immutability of sex and the appropriateness of a teenage male competing against teenage females in an athletic competition, and in so doing to refer to a male as a male.

E. Nominal and compensatory damages against Defendants Board and Sousa;

F. Coach Bloch's reasonable attorney's fees, costs, and other disbursements pursuant to 42 U.S.C. § 1988; and

G. Any other relief to which Coach Bloch may be entitled.

Dated: July 17th, 2023

Respectfully submitted,

Anthony R. Duprey
VT Bar No. 3204
Duprey Law, PLLC
11 Main Street, Suite B110F
Vergennes, Vermont 05491
Telephone: (802) 870-6563
anthony@dupreylaw.com

David A. Cortman
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd NE
Suite D1100
Lawrenceville, Georgia 30043
Telephone: (571) 707-4655
Facsimile: (571) 707-4656
dcortman@ADFlegal.org

Tyson C. Langhofer*
VA Bar No. 95204
Mathew Hoffmann*
DC Bar No. 1617417
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4656
tlanghofer@ADFlegal.org
mhoffmann@adflegal.org

*Counsel for Plaintiff*

**Pro Hac Vice application filed concurrently*

**DEMAND FOR TRIAL BY JURY**

Plaintiff David J. Bloch hereby demands a trial by jury for all issues so triable.

Anthony R. Duprey
*Counsel for Plaintiff*

## DECLARATION UNDER PENALTY OF PERJURY

I, David J. Bloch, a citizen of the United States and a resident of the State of Vermont, declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing Verified Complaint is true and correct to the best of my knowledge.

Executed this 12th day of July, 2023, at Woodstock, Vermont.

David J. Bloch