UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| DAVID J. BLOCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 2:23-CV-00209 |
| | ) | |
| HEATHER BOUCHEY, in her official capacity as Interim Secretary of the Vermont Agency of Education, | ) ) ) | |
| | ) | |
| JAY NICHOLS, in his official capacity as Executive Director of the Vermont Principals' Association, | ) ) ) | |
| | ) | |
| WINDSOR CENTRAL SUPERVISORY UNION BOARD, and | ) ) | |
| | ) | |
| SHERRY SOUSA, in her official and individual capacities as Superintendent of Windsor Central Supervisory Union, | ) ) ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT HEATHER BOUCHEY'S**
**MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW**

Defendant Heather Bouchey, in her official capacity as Interim Secretary of the Vermont Agency of Education, hereby moves to dismiss all claims against her pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). In support, she submits the following memorandum of law.

**MEMORANDUM OF LAW**

The Superintendent of the Windsor Central Supervisory Union, Defendant Sousa, fired Plaintiff from his position as a high school snowboarding coach allegedly based on the state anti-harassment policy. Five months later, Plaintiff sued and moved for a preliminary injunction,

1

claiming the harassment policy is invalid under the First Amendment, both facially and as applied to him and claiming retaliation for exercising his First Amendment right to free speech.

Assuming the allegations in the complaint are true, Plaintiff lacks standing to bring his facial challenge or to sue Interim Secretary Bouchey.[1] Secretary Bouchey played no role in Plaintiff's termination.[2] And if the allegations are true, Plaintiff's conduct as alleged does not meet the State's objective definition of harassment. The harassment policy and the procedures that go with it did not mandate Plaintiff's termination. And Defendant Sousa's decision was never substantiated. Secretary Bouchey, and Plaintiff's facial challenge, should be dismissed.

Even if the Court does consider Plaintiff's facial challenge, it should be dismissed for failure to state a claim. Plaintiff vastly overreads the harassment policy and ignores its limiting, objective "purpose or effect" clause. Specifically, the harassment policy only prohibits bias-based speech or conduct that has the "purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment." Vt. Stat. Ann. tit. 16, § 11(a)(26)(A). Properly applied, this clause limits the

---

[1] Of course, if Plaintiff's allegations are false or incomplete, his as-applied claims against the School Defendants may be meritless as well. But because Plaintiff appears to only assert a facial claim against Secretary Bouchey, this motion addresses only that facial claim, and assumes the truth of Plaintiff's allegations.

[2] Plaintiff rightly does not ask for damages against Secretary Bouchey, because she was not personally involved in his termination. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983" (quotation omitted)). Although Plaintiff's complaint and motion are not perfectly clear, his as-applied and retaliation claims rightly do not appear to be addressed to Secretary Bouchey, because he would not have standing to assert any such claims against her. *See* Compl. ¶¶ 10, 115-133 (referring exclusively to the School Defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983" allegedly retaliatory termination by Defendant Sousa); *but see* Compl. ¶¶ 171–233 (engaging in impermissible group pleading by referring to all Defendants as to all claims without differentiation, even as to events Plaintiff does not allege Secretary Bouchey was involved with). If Plaintiff does seek to assert an as-applied claim against Secretary Bouchey, Secretary Bouchey respectfully requests leave to submit a supplemental submission addressing any such claim.

harassment policy so that it facially comports with the First Amendment—whether through the doctrines of overbreadth, prior restraint, content neutrality, or vagueness.

In any event, the harassment policy survives any level of scrutiny the Court may apply. It is narrowly tailored to the State's compelling interest in maintaining an effective public school system. Harassment, and bias-based harassment in particular, is well documented to negatively affect student health and performance. And by prohibiting only harassment that objectively negatively affects student performance, access, or the educational environment, the harassment policy is narrowly tailored to the State's interest.

## BACKGROUND

Plaintiff alleges he was fired based on a private, nondisruptive conversation he had with two of his student-athletes prior to a competition. According to Plaintiff, he was waiting with his students in the lodge during "down time" before a competition. Compl. ¶¶ 92, 94. The opposing team, which included a transgender athlete competing on the girls' team, was not present. *Id.* ¶¶ 92-93. Two of Plaintiffs' students began discussing transgender athletes. *Id.* ¶¶ 95-98. Plaintiff interjected to "assert[] that as a matter of biology, males and females have different DNA" which "cause males to develop differently from females and to have different physical characteristics." *Id.* ¶¶ 101-02. Plaintiff opined that this "generally gives males competitive advantages in athletic competitions." *Id.* ¶ 103. Plaintiff did not refer to the transgender athlete on the other team. *Id.* ¶ 104. The conversation was allegedly short, private, and non-disruptive. *Id.* ¶¶ 105-12. The conversation allegedly did not involve any transgender people. *Id.* ¶ 113.

The next day, Defendant Sousa fired Plaintiff, citing both the Windsor Central Supervisory Board's Harassment, Hazing, and Bullying Policy and the Vermont Principals' Association Athletics Policy, which governs the snowboarding league. Compl. ¶ 118; Doc. 1-10.

The termination letter stated that Plaintiff's "use of disparaging names created an objectively offensive environment and constituted harassment based on gender identity[.]"Compl. ¶ 121; Doc. 1-10. The termination letter stated that Plaintiff will not be rehired. Doc. 1-10. Plaintiff's seasonal contract to coach snowboarding had been renewed annually. Compl. ¶¶ 135-36. Secretary Bouchey was not involved in Plaintiff's termination. *Id.* ¶¶ 115-39.

The Board's Harassment Policy contains the same definition of harassment as the Agency of Education's model harassment policy, which in turn contains the same definition of harassment as state statute, Vt. Stat. Ann. tit. 16, § 11(a)(26). That definition prohibits speech or conduct, based on or motivated by a student's or student's family member's protected characteristics,[3] "that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment." *Id.* State law requires the Agency to develop a model harassment policy and every school district to adopt a policy "at least as stringent as" the Agency's model policies. Vt. Stat. Ann. tit. 16, § 570.

The Agency created model procedures to accompany its model policies. Doc. 1-12. For each complaint of harassment, these procedures require an investigator to be assigned, notice to be provided to the alleged perpetrator, an opportunity for the alleged perpetrator to call witnesses and present evidence, and a written investigative report detailing the investigator's findings of whether the complaint was substantiated. *Id.* at 3-6. Windsor School District has substantially adopted these procedures. Doc. 1-13.

Defendant Sousa, along with Defendant Windsor Supervisory Union Board (together, "School Defendants"), allegedly did not follow the required procedures when firing Plaintiff.

---

[3] Specifically, "actual or perceived race, creed, color, national origin, marital status, sex, sexual orientation, gender identity, or disability[.]" Vt. Stat. Ann. tit. 16, § 11(a)(26)(A).

Compl. ¶¶ 129-33. They allegedly did not provide him with notice, an opportunity to present witnesses or evidence, or an investigative report. *Id.*

## ARGUMENT

### I.   Motion to dismiss standard

To survive a motion to dismiss under Rule 12(b)(1), a complaint must "allege[] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quotation omitted). Plaintiff has the burden of proving subject-matter jurisdiction exists, and "that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation omitted), *aff'd*, 561 U.S. 247 (2010). "In reviewing subject matter jurisdiction, the Court may look to matters beyond the pleadings." *Lakhani v. U.S. Citizenship & Immigration Servs.*, No. 2:12-CV-95, 2013 WL 3829624, at *2 (D. Vt. July 23, 2013).

Under Rule 12(b)(6), complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A district court must accept all factual assertions as true and draw all reasonable inferences in favor of the plaintiff in assessing the adequacy of the complaint under Rule 12(b)(6). *See Wilson v. Merrill Lynch & Co., Inc.,* 671 F.3d 120, 128 (2d Cir. 2011). However, this presumption of truth "is inapplicable to legal conclusions," and the court should not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint

suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S.

at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

## II. Plaintiff lacks standing to sue Secretary Bouchey or challenge the harassment policy on its face because he has not alleged causation.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a

sufficient 'causal connection between the injury and the conduct complained of,' and (3) a

'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v.*

*Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560-61 (1992)). Standing is normally not available where an injury is "the result of the

independent action of some third party." *Lujan*, 504 U.S. at 560. In such cases, "standing is not

precluded, but it is ordinarily substantially more difficult to establish." *Id.* at 562 (quotation

omitted). In such a case, a plaintiff must show that their injury is "fairly traceable" to a defendant

to show causation. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 59 (2d Cir. 2016).

In addition, a party may lack standing to challenge a law where the law has admittedly

not been correctly applied. *New York Civ. Serv. Comm'n v. Snead*, 425 U.S. 457, 458 (1976). To

have standing to raise a First Amendment challenge to a law, a party's activity must come

"within the ambit of the specific rule of law that she challenges." *United States v. Smith*, 945

F.3d 729, 737 (2d Cir. 2019); *see Hedges v. Obama*, 724 F.3d 170, 195-99 (2d Cir. 2013).

In *Snead*, a New York City employee alleged that she had been placed on involuntary

medical leave based on the findings of a physician who was chosen in a manner that violated

New York Civil Service Law § 72. She challenged the facial constitutionality of the statute by

suing the State. The State did not dispute that the selection of the physician was contrary to the

statute. As a result, it was undisputed that "that the statutory procedure which [the plaintiff]

challenged has not been applied to her." *Snead*, 96 S. Ct. at 1631. The Supreme Court held that the plaintiff might have a claim against the City, but that she lacked standing to seek "a determination of the constitutionality of a statute which . . . has never in fact been properly applied . . . to her." *Id.*

So too here. Plaintiff alleges that the School Defendants terminated him for conduct that, as alleged, does not meet the State's definition of harassment and that they did so without using the State's procedures for investigation or substantiation. For example, Plaintiff alleges that he was not provided an opportunity to present witnesses or other evidence, in contravention of State policy, and that he has repeatedly requested, but not received, a written report from an assigned investigator about whether the allegations against Plaintiff were substantiated. Compl. ¶¶ 126, 129, 130-33; Doc. 1-12 at 5.

Plaintiff alleges that he spoke privately, in a nondisruptive manner, to two cisgender students about his opinions on biology and sex. Compl. ¶¶ 92-113. If Plaintiff's allegations are true, they do not appear to have had the "purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment" required to fit within the scope of the State policy Plaintiff seeks to challenge. Vt. Stat. Ann. tit. 16, § 11(a)(26)(A). As explained below, this objective purpose or effect is required to meet the State definition of harassment. *See* Part III.

That Defendant Sousa may have decided otherwise does not change the analysis. It is well established that an individual police officer's subjective belief that an individual has violated a law is "irrelevant" to the objective question of whether there was probable cause for the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *United States v. Gagnon*, 373 F.3d

230, 239 (2d Cir. 2004). By the same token, the Court here can decide that if Plaintiff's allegations are true, the State's policy did not apply to Plaintiff on its face.

Plaintiff does not allege that Secretary Bouchey or anyone else from the State was involved in his termination. School district hiring and firing decisions are entirely within the control of the School Defendants, not the State, and Secretary Bouchey has no ability to override them. *Compare* Vt. Stat. Ann. tit. 16, § 242(3) (a superintendent shall "dismiss [] nonlicensed employees of a school district . . . as necessary") *with id.* § 212 ("Secretary's duties" do not include oversight of hiring and firing decisions). Plaintiff's injury is therefore not "fairly traceable" to Secretary Bouchey or to State policy—rather, it is traceable only to the School Defendants.

Plaintiff has failed to allege facts that if true, would establish that State law, policy, or personnel caused his termination or injury. Secretary Bouchey, and Plaintiff's facial challenges, should be dismissed.

## III. The harassment policy is not substantially overbroad in relation to its plainly legitimate sweep.

"[P]articularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. A substantially overbroad law violates the First Amendment because "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects" *United States v. Williams*, 553 U.S. 285, 292 (2008). Thus, the Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*[.]" *Id.* Where overbreadth may exist but is not substantial, it "should be cured through case-by-case

analysis" of the facts in as-applied challenges, rather than through facial invalidation. *Broadrick*, 413 U.S. at 615-16. "The overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (quoting *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14 (1988)). "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023).

"The first step in overbreadth analysis is to construe the challenged statute[.]" *Williams*, 553 U.S. at 293. Then the Court can determine if the properly-construed statute presents "a lopsided ratio" of realistic lawful to unlawful applications. *Hansen*, 143 S. Ct. at 1940. If not, "courts must handle unconstitutional applications as they usually do—case-by-case." *Id.*

### A. The harassment policy, properly construed, only prohibits conduct that objectively interferes with educational access.

By its plain terms, the harassment policy targets only language and conduct with "the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment." Vt. Stat. Ann. tit. 16, § 11(a)(26)(A). This objective "purpose or effect" clause modifies everything else in the definition of harassment.[4]

Section 11(a)(26)(B) of Title 16 begins: "'Harassment' *includes* conduct that violates subdivision (A) of this subdivision (26) *and* constitutes one or more of the following . . . (i) Sexual harassment . . . (ii) Racial harassment . . . [or] (iii) Harassment of members of other protected categories[.]" Vt. Stat. Ann. tit. 16, § 11(a)(26)(B) (emphasis added). By using

---

[4] The policy is therefore distinguishable from the one rejected in *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001): the *Saxe* policy was overbroad because it could be applied subjectively.

"includes" and "and," subsection (B) explains that harassment *must* meet the definition set out § 11(a)(26)(A) and, in so doing, *may* also qualify as "sexual harassment," "racial harassment," or harassment of "other protected categories."[5] But the subdivision (A) definition—including the "purpose or effect" clause—must be met to constitute harassment.

Plaintiff ignores the "purpose or effect" clause entirely. Instead, he cherry-picks single words out of the rest of the harassment definition in § 11(a)(26), effectively arguing that words like "comments" and "includes" are completely unbounded by the rest of the definition. Compl. ¶¶ 214-20. They are not. And he argues that the harassment policy penalizes a single incident of speech. While it is possible that a single instance of verbal misconduct could satisfy the "purpose or effect" clause, it does not seem likely. *Accord Davis*, 526 U.S. at 652 ("Although, in theory, a single instance of sufficiently severe . . . harassment could be said to have" "the systemic effect of denying the victim equal access to an educational program or activity," it is "unlikely . . . to rise to this level[.]").

Properly construed, all harassment under the harassment policy must meet the objective "purpose and effect" clause of § 11(a)(26)(A).

### B.  The harassment policy is not overbroad relative to its plainly legitimate sweep.

Application of the objective "purpose and effect" clause reveals that the harassment policy is not overbroad for two reasons. First, its plainly legitimate sweep encompasses largely

---

[5] The Legislature may have spelled out these three categories due to concerns about these special kinds of harassment persisting in Vermont schools. *See, e.g.*, An act relating to ethnic and social equity studies standards for public schools, 2019 Vt. Laws No. 1, § 1(a) (making findings about racial harassment and harassment of marginalized groups in Vermont and Vermont schools) (citing Vt. Advisory Comm. to the U.S. Comm. on Civil Rights, Racial Harassment in Vermont Public Schools: A Progress Report (Oct. 2003), https://hrc.vermont.gov/sites/hrc/files/publications/sac_racial_harassment_in_schools_report_2003.pdf and Vt. Advisory Comm. to the U.S. Comm. on Civil Rights, Racial Harassment in Vermont Public Schools (Feb. 1999), https://www.usccr.gov/files/pubs/sac/vt0299/main.htm).

regulable government employee speech for school staff like Plaintiff. And second, contrary to Plaintiff's allegations, the harassment policy largely regulates the same conduct for which a school could be held civilly liable.

> ### i.   The harassment policy is a reasonable regulation on government employee speech.

The policy's legitimate sweep largely overlaps with the First Amendment doctrines most applicable to the people affected by the harassment policy: public elementary and high school teachers, staff, and students. Using this approach, the harassment policy clearly covers largely regulable government employee and student speech.

The First Amendment protects a public employee's speech only when it is "made as a citizen on matters of public concern rather than as an employee on matters of personal interest." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) (quotation omitted). When a public employee speaks pursuant to their "official duties," their speech is not protected. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). And when a public employee speaks on a "personal grievance" or issue that is "personal in nature," their speech is not protected. *Quinones v. City of Binghamton*, 997 F.3d 461, 466-67 (2d Cir. 2021). But even where a public employee speaks as a private citizen on a matter of public concern, their speech may still be restricted if their employer "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. In other words, the restrictions imposed "must be directed at speech that has some potential to affect the entity's operations." *Id.*

In such a case, the Court must weigh "'the interests of the citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Pappas v. Giuliani*, 290 F.3d 143, 145–46 (2d Cir. 2002) (alteration omitted) (quoting *Pickering v. Bd. of Educ.*, 391 U.S.

563, 568 (1968)). Under the *Pickering* test, "the government can prevail if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities, and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech." *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998) (citation omitted). The government does not need to show actual disruption—it "need only make a reasonable determination that the employee's speech creates the potential for such harms." *Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007). The government only needs to show the potential impact of the speech on "maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute." *Id.* The Court must give "substantial weight" to the government's "reasonable predictions of disruption." *Waters v. Churchill*, 511 U.S. 661, 673 (1994); *see also Piscottano*, 511 F.3d at 271.

The harassment policy fits squarely into the *Pickering* test for regulable government employee speech. The harassment policy concerns only speech or conduct that objectively negatively interferes with student performance or access to resources, or that which creates an objectively negative educational environment. Thus, the harassment policy only prohibits speech that is objectively likely to affect the school's "efficiency, discipline, and integrity" or to disrupt operations. *Piscottano*, 511 F.3d at 271. So, in the unlikely scenario where a school employee is speaking as a private citizen on a matter of public concern, but having an objectively negative impact on an individual student's performance or creating an objectively offensive school environment, the employee's speech may still be regulated as reasonably disruptive to the educational mission of the school. The harassment policy easily passes the *Pickering* test.

Plaintiff does not argue that the harassment policy is overbroad for students, nor does he have standing to do so. But because the policy is constrained by objective purpose and effect on the educational mission of a school, it is also well within the bounds of regulable student speech. "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986). Schools have long been able to prohibit student speech or conduct that creates a "'substantial disruption' of a school activity or a threatened harm to the rights of others[.]" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2047 (2021) (quoting *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 514 (1969)); *see also Fraser*, 478 U.S. at 683, 685 (school can insist on "civil discourse" in the school context, thereby teaching and reinforcing "the shared values of a civilized social order"). The harassment policy does just that.

      ii.    **The harassment policy is not significantly broader than the civil liability standard to which Plaintiff compares it.**

Plaintiff points to the standard under which schools can be held civilly *liable* for student-on-student harassment under Title IX and argues, without support, that the liability standard defines the outer limits of what schools can prohibit consistent with the First Amendment. Compl. ¶¶ 195, 208, 220; Doc. 2-1 at 12-13. The liability standard is for *peer-on-peer* harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."[6] *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). Notably, the

---

[6] Other elements of civil liability under Title IX include that the school have actual knowledge of the harassment and that the school be deliberately indifferent to the harassment. *Davis*, 526 U.S. at 650.

"standard for student-on-student sexual harassment claims is far more rigorous than a claim for teacher-on-student harassment." *Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (citing *Davis*, 526 U.S. at 650-53).[7]

Plaintiff's argument fails because his preferred liability standard is much closer to the properly construed state harassment policy than he acknowledges. Both the liability standard and the state harassment policy target an objective determination that a student has been deprived of access to educational opportunities as a result of harassment. The state harassment policy forbids "objectively and substantially . . . interfering with a student's educational performance or access to school resources," which may in fact be narrower than "educational opportunities or benefits." There are only three ways in which the state harassment policy might be said to sweep more broadly than the liability standard, but none is helpful to Plaintiff.

First, the state harassment policy differs from the liability standard because the state policy prohibits conduct for which the purpose is to deprive a student of educational opportunities, even if the deprivation is not successful. Schools are rightly not liable for attempts to deprive students of educational opportunities that do not succeed. But it would defeat the purpose of holding schools liable for actual deprivations of educational access if schools could not also punish purposeful attempts. When a school may be liable if a perpetrator succeeds, the school has a compelling interest in targeting a purposeful attempt.

Second, the harassment policy's prohibition on "undermining and detracting from or interfering with" is arguably more expansive than the liability standard's "depriving." But *Davis* itself acknowledges that victims can be "effectively denied equal access to an institution's

---

[7] The proposed federal 2022 Title IX regulations do not differentiate between teachers and students in defining sexual harassment, but account for the parties' ages and roles in the "fact-specific inquiry" of "whether a hostile environment has been created[.]" Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390-01 (July 12, 2022).

resources and opportunities" where harassment "so undermines and detracts from the victims'

educational experience" or where the harassment has a "concrete, negative effect" on a student's

"ability to receive an education." *Davis*, 526 U.S. at 651, 654; *see Jennings v. Univ. of N.

Carolina*, 482 F.3d 686, 699 (4th Cir. 2007) (discussing three ways of proving Title IX

harassment under *Davis*). Thus, under *Davis*, undermining, detracting, and interfering all cause

at least partial deprivations of full educational access. And a school may be held civilly liable for

a partial deprivation of access to educational opportunities. *Davis*, 526 U.S. at 651, 654;

*Jennings*, 482 F.3d at 699. By Plaintiff's own argument, then, a school may likewise prohibit

partial deprivations of access to educational opportunities.

      Third, the harassment policy prohibits "creating an objectively intimidating, hostile, or

offensive environment." The state harassment policy allows for two potential avenues to show

harassment: harassment of a single student, which interferes with that student's performance in

school or access to school resources, or harassment which is so sweeping that it creates an

environment that is intimidating, hostile, or offensive to a reasonable person. It would be

difficult, if not impossible, to find a school environment that is intimidating, hostile, or offensive

to a reasonable person but does not interfere with student access to educational opportunities.

Plaintiff has not offered a single hypothetical that could meet this standard.

      And even if he could, the harassment policy's substantial, plainly legitimate sweep

dwarfs any hypothetical violations of the First Amendment Plaintiff might conceive at the

margins. Plaintiff effectively concedes that the harassment policy's plainly legitimate sweep

includes all areas of overlap with the liability standard. The Court need not look any further than

the liability standard to dismiss Plaintiff's overbreadth claim.

15

**IV.     The harassment policy does not constitute an unlawful prior restraint.**

Plaintiff has not treated his prior restraint argument as particularly distinct from his overbreadth argument, so the Court should not analyze it separately. *Smith*, 945 F.3d at 739 (not addressing prior restraint or content-based claims separately from overbreadth claim because they were not so raised). But if the Court chooses to engage with this argument, the Court will find the harassment policy is not an unlawful prior restraint.

"[I]f rules 'condition the exercise of expressive activity on official permission . . . they . . . constitute a 'prior restraint' on speech." *MacDonald v. Safir*, 206 F.3d 183, 194 (2d Cir. 2000) (quoting *Beal v. Stern*, 184 F.3d 117, 124 (2d Cir. 1999)). "The essence of prior restraints are that 'they g[i]ve public officials the power to deny use of a forum in advance of actual expression.'" *Beal*, 184 F.3d at 124 (quoting *Se. Promos., Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)). Licensing and permitting schemes are quintessential examples of prior restraints. *Id.* (collecting cases). A government press policy that requires all government employees to receive "preclearance" before speaking to the media is another example of a prior restraint. *Harman v. City of New York*, 140 F.3d 111, 120 (2d Cir. 1998). Prior restraints allow governments to "control the timing" of proposed speech by controlling the timing of the approval process. *Id.* And prior restraints raise concerns about governments exercising unbridled censorship discretion, in which the government gives one person permission to speak while denying permission to another. *Id.*

Another, less common type of prior restraint imposed on government employees addresses "flat prohibitions on employee speech" on certain topics. *Moonin v. Tice*, 868 F.3d 853, 871 (9th Cir. 2017). Under this doctrine, the First Amendment forbids "a policy prohibiting public discussion of matters of public concern by employees of a particular government program,

without a countervailing showing of substantial workplace disruption[.]" *Id.* at 872. Courts have analyzed this kind of flat prohibition either as a prior restraint or simply for facial overbreadth. *Id.* at 872-74 (discussing cases). Where the government imposes a prior restraint on its own employees, the restraint is valid where it meets the *Pickering* balancing test described above. *Harman*, 140 F.3d at 117.

The harassment policy is not a prior restraint on speech. It does not require any pre-approval or preclearance of speech—it imposes, instead, a subsequent punishment after certain disruptive speech occurs. And the harassment policy is not a categorical ban on discussing specific topics. As explained above in Part III, the harassment policy targets only speech that has an objective purpose or effect harmful to the educational mission of a school. And even if the Court finds a prior restraint, the policy is constitutional because it passes *Pickering*.

Plaintiff's prior restraint claim should be dismissed.

### V.   The harassment policy does not constitute unlawful content or viewpoint discrimination.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Viewpoint discrimination is just "an egregious form of content discrimination" where "the government targets not subject matter [content], but particular views taken by speakers on a subject[.]" *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint discrimination is presumed unconstitutional. *Id.* at 830.

"The principal inquiry in determining whether a regulation is content-based or content-neutral 'is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys.'" *Clementine Co., LLC v. Adams*, 74 F.4th 77, 87 (2d

Cir. 2023) (quoting *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 155 (2d Cir. 2013)). A regulation is not content based simply because applying it requires knowing who is speaking and what they are saying. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022). Rather, the Court must examine "the purpose behind the regulation" to determine whether it is content based. *Clementine Co.*, 74 F.4th at 87 (quotation omitted). "[T]ypically, government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech." *Id.* (quotation omitted). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (quotation omitted).

The Supreme Court has repeatedly held that regulations are content neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464 (2014) (finding statute establishing buffer zones only at abortion clinics was content neutral because violation of statute depended not "on what they say," but "simply on where they say it," and stated purpose of the statute was public safety); *Renton v. Playtime Theatres*, 475 U.S. 41, 47 48 (1986) (holding that zoning ordinance that applied only to theaters showing sexually explicit material was content neutral because it was not aimed at suppressing erotic speech but instead at the crime and lowered property values that typically accompany such theaters).

A content-neutral regulation that imposes incidental burdens on speech must satisfy intermediate scrutiny. *Id.* at 88. It does so if it "if it (1) advances important governmental interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests." *Id.* (quotations omitted). A content-neutral

18

regulation does not need to be "the least restrictive or least intrusive means of serving the statutory goal.'" *Id.* (quotation omitted).

The harassment policy is content neutral. The purpose of the policy is to prevent disruption to student performance, access to school resources, and the educational environment. Vt. Stat. Ann. tit. 16, § 11(a)(26)(A). The Agency's model policy confirms that the purpose of the policy is to "prohibit conduct or communication . . . that has the purpose or effect of substantially disrupting the educational learning process and/or access to educational resources or creates a hostile learning environment[.]"[8] Doc. 1-11 at 3. In other words, the purpose is to limit disruption to the educational mission of the school.

Thus, the policy is not justified based on the government's disagreement with a particular message or viewpoint. School students and staff are free to express their views. But they must do so in a way that does not "objectively and substantially undermin[e] and detract[] from or interfer[e] with a student's educational performance or access to school resources or creat[e] an objectively intimidating, hostile, or offensive environment." Vt. Stat. Ann. tit. 16, § 11(a)(26)(A). That is the legitimate, content-neutral purpose of the policy: effective public education.

And the harassment policy "applies equally to individuals on either side of a given debate." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-CV-01595, 2023 WL 4848509, at *16 (S.D. Ohio July 28, 2023). The policy prohibits "speech that targets individuals on the basis of gender identity (or race, age, religion, etc.)" that has the

---

[8] The policy contains a second purpose, to "prohibit conduct intended to ridicule, humiliate or intimidate students in a manner as defined under this policy." Doc. 1-11 at 3. This language is copied from the definition of "bullying." Doc. 1-11 at 4. The definition of bullying is limited to conduct occurring at school or during school events, or conduct which "can be shown to pose a clear and substantial interference with another student's right to access educational programs." *Id.* Plaintiff rightly does not challenge the definition of bullying.

required objective purpose or effect. *Id.* The gender identity prohibition applies "with equal force to students who identify as transgender as to those who identify as cisgender, to those who seek to denigrate students on account of their transgender identity and to those who seek to harass students who believe that gender at birth is immutable." *Id.*; *see* Emily Gold Waldman, *A Post-Morse Framework for Students' Potentially Hurtful Speech (Religious and Otherwise)*, 37 J.L. & Educ. 463, 492 (2008) (distinguishing between "speech that identifies particular students for attack" and speech "that expresses a general political, social, or religious viewpoint without directly naming or speaking to particular students"); Eugene Volokh, *Comment: Freedom of Speech and Workplace Harassment*, 39 UCLA L. Rev. 1791, 1871–72 (1992) (suggesting that "[d]irected speech can be suppressed with minimum impact on First Amendment interests" because the political viewpoint of an ad hominem attack is often separable from the attack itself).

Therefore, the harassment policy is content neutral, and must only satisfy intermediate scrutiny. However, the harassment policy passes not just intermediate scrutiny, but also strict scrutiny, for the reasons explained below.

## VI.   The harassment policy survives any level of scrutiny.

Laws subject to strict scrutiny, including content-based laws, may be upheld if they are "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Whether a regulation is narrowly tailored turns on "the scope of its application relative to the government objectives being pursued." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 102 (2d Cir. 2006). The harassment policy is narrowly tailored to serve compelling state interests.

The State has a compelling interest in maintaining student access to objectively harassment-free public-school environments. Basic public education is "perhaps the most important function of state and local governments." *Brown v. Bd. of Ed.*, 347 U.S. 483, 493

(1954). "A crucial element of that responsibility is maintaining an environment conducive to fulfilling the state's educational mission." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 267–68 (3d Cir. 2002). And "discriminatory speech that arises to the level of creating a hostile environment can have severely negative effects on students' attendance and performance in school and their physical and psychological wellbeing—in other words, on the orderly operation of the school and its mission." *Parents Defending Educ.*, 2023 WL 4848509, at *12 (citing *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204*, 523 F.3d 668, 674 (7th Cir. 2008) and *Morse v. Frederick*, 551 U.S. 393, 407 (2007)).

Vermont's legislature has reaffirmed this interest many times. *See* Vt. Stat. Ann. tit. 16, § 570(a) ("It is the policy of the State of Vermont that all Vermont educational institutions provide safe, orderly, civil, and positive learning environments. Harassment, hazing, and bullying have no place and will not be tolerated in Vermont schools."); 2000 Vt. Laws No. 120 ("[S]tudents who are continually filled with apprehension and anxiety are unable to learn and unlikely to succeed."); 1994 Vt. Laws P.A. 162 ("[U]nlawful harassment against students can be a severe problem that inflicts harm on its victims and the entire educational community.").

Harassment in schools, and identity-based harassment in particular, correlates with lower student health and performance—and, therefore, lowers the efficacy of public education. Peer harassment in middle school generally "predicts poor psychological adjustment, which in turn compromises school outcomes." Jaana Juvonen et al., *Peer harassment, psychological adjustment, and school functioning in early adolescence*, 92 J. of Educ. Psychology 349, 356 (2000). And public middle and high school students experiencing "biased-based" harassment— harassment based on personal characteristics such as race/ethnicity, sexual orientation, religion, or disability—are more likely to have poor mental health outcomes, get lower grades, and skip

school than those experiencing non-biased-based harassment. Stephen T. Russell et al., *Adolescent Health and Harassment Based on Discriminatory Bias*, 102 Am. J. of Public Health 493-95 (Mar. 2012).[9] Experiences of racial or ethnic discrimination in middle school is predictive of declines in grades, academic motivation, and mental health. Carol A. Wong et al., *The influence of ethnic discrimination and ethnic identification on African American adolescents' school and socioemotional adjustment*, 71 J. Personality 1197 (Dec. 2003). Both bullying and sexual harassment are associated with negative well-being and performance in high school students. Brittany Z. Crowley & Dewey Cornell, *Associations of bullying and sexual harassment with student well-being indicators*, 10 Psychology of Violence 615-25 (2020).

High school students in some protected classes, particularly girls and LGBTQ students, are also more likely to experience bullying than their peers, both nationwide and in Vermont. Ctr. for Disease Control & Prevention, Youth Risk Behavior Survey: Data Summary & Trends Report: 2011-2021 ("CDC YRBS"), 51 (Feb. 13, 2023) (nationally, LGBTQ students twice as likely to be subject to bullying than heterosexual students, girls slightly more likely than boys);[10] Vt. Dept. of Health, Vermont Youth Risk Behavior Survey: Statewide Results ("Vermont YRBS"), 25 (2021)[11] (similar results for Vermont).[12] Transgender youth specifically experience levels of discrimination, violence, and harassment that exceed those experienced by their cisgender counterparts. Gay, Lesbian and Straight Education Network (GLSEN), Joseph G.

---

[9] https://ajph.aphapublications.org/doi/epub/10.2105/AJPH.2011.300430.
[10] https://www.cdc.gov/healthyyouth/data/yrbs/pdf/YRBS_Data-Summary-Trends_Report2023_508.pdf.
[11] https://www.healthvermont.gov/sites/default/files/document/hsi-yrbs-2021-full-report.pdf.
[12] Girls and LGBTQ students were also twice as likely to have poor mental health than their peers. CDC YRBS at 62; Vermont YRBS at 46. And girls and LGBTQ students were more likely to have considered or attempted suicide during the past year than their peers. CDC YRBS at 67; Vermont YRBS at 51. Transgender people attempt suicide at a rate nearly nine times that of the general population. Nat'l Ctr. for Transgender Equal., Sandy E. James et al.*, The Report of the 2015 U.S. Transgender Survey* 131-35 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xxvii, 84 (2022).[13] In Vermont, 82% of people who were out or perceived as transgender during primary or high school experienced harassment or mistreatment as a result. Nat'l Ctr. for Transgender Equality, 2015 U.S. Transgender Survey: Vermont State Report (Oct. 2017).[14]

Because harassment, and identity-based harassment in particular, predicts poorer outcomes in school and student well-being, the State has a compelling interest in preventing it. The State's interest is heightened even further for sex-, gender identity-, and sexual orientation-based harassment because it is so common and so harmful to the mental health of girls and LGBTQ students. It does not matter that the State has focused on identity-based harassment rather than general harassment. The Supreme Court has regularly "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015).

The harassment policy is also narrowly tailored. As explained above, the objective "purpose or effect" clause of § 11(a)(26)(A) ensures that the harassment policy targets only speech or conduct that causes or attempts to cause a substantial disruption to the school's educational mission. *See supra* Part III.

---

[13] https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf; *see also* GLSEN, *Improving School Climate for Transgender and Nonbinary Youth* 1 (2021), https://www.glsen.org/sites/default/files/2021-11/GLSEN_Trans%26Nonbinary_ResearchBrief.pdf; GLSEN, Emily A. Greytak et al., *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* xi (2009), https://files.eric.ed.gov/fulltext/ED505687.pdf; Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Morality Weekly Report 67, 67-70 (2019).
[14] https://transequality.org/sites/default/files/docs/usts/USTSVTStateReport(1017).pdf

**VII.    The harassment policy is not void for vagueness.**

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "Thus, all vagueness challenges—whether facial or as-applied—require [a court] to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006). Statutes are vague if they require "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008).

The level of precision required varies based on context. For example, a government employer may "prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Waters v. Churchill*, 511 U.S. 661, 673 (1994). Even in the criminal context, where statutes must be precise enough to apply to the public at large, statutes forbidding "harassment" are generally upheld against vagueness challenges where they include "a specific intent to harass[.]" *United States v. Waggy*, 936 F.3d 1014, 1020 (9th Cir. 2019) (collecting cases, including *Gormley v. Dir., Conn. State Dep't of Prob.*, 632 F.2d 938, 941–42 (2d Cir. 1980)).

So too here. As with Plaintiff's other First Amendment challenges, his vagueness challenge fails because of the limiting, objective "purpose or effect" clause. This clause answers both vagueness questions: it gives adequate notice of the prohibited conduct, and it constrains enforcement to only those situations that meet the objective criteria.

**CONCLUSION**

This Court should dismiss all claims against Secretary Bouchey.


DATED at Montpelier, Vermont, this 31st day of August 2023.

> STATE OF VERMONT
>
> CHARITY R. CLARK
> ATTORNEY GENERAL
>
>
> By:    */s/ Eleanor L.P. Spottswood*
> Eleanor L.P. Spottswood
> Solicitor General
> Jaime Kraybill
> Assistant Attorney General
> Office of the Attorney General
> 109 State Street
> Montpelier, VT 05609-1001
> 802-793-1646
> eleanor.spottswood@vermont.gov