UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

DAVID J. BLOCH,

    *Plaintiff,*

v.

HEATHER BOUCHEY, in her official
capacity as Interim Secretary of the Vermont
Agency of Education,

JAY NICHOLS, in his official capacity as
Executive Director of the Vermont Principals'
Association,

WINDSOR CENTRAL SUPERVISORY
UNION BOARD, and

SHERRY SOUSA, in her official and
individual capacities as Superintendent of
Windsor Central Supervisory Union,

    *Defendants.*

Civil Action No. 2:23-cv-209

## DEFENDANTS WINDSOR CENTRAL SUPERVISORY UNION BOARD AND WINDSOR CENTRAL SUPERVISORY UNION SUPERINTENDENT SHERRY SOUSA'S MOTION TO DISMISS FACIAL CHALLENGES SET FORTH IN PLAINTIFF'S SECOND, THIRD, AND FOURTH CAUSES OF ACTION

Defendants Windsor Central Supervisory Union Board and Windsor Central Supervisory

Union Superintendent Sherry Sousa (collectively, "the Supervisory Union Defendants"),[1] by and

through counsel, Lynn, Lynn, Blackman & Manitsky, P.C., and pursuant to Federal Rule of Civil

Procedure 12(b)(6), move to dismiss the facial First Amendment challenges set forth in the second,

---

[1] On July 1, 2023, Windsor Central Supervisory Union became Mountain Views Supervisory Union. The Supervisory Union Defendants assume that Plaintiff, in his Complaint filed July 17, 2023, intended to name the Mountain Views Supervisory Union Board of Directors and Superintendent Sousa in her official capacity as Superintendent of the Mountain Views Supervisory Union.

third, and fourth causes of action in Plaintiff David J. Bloch's Verified Complaint.  In support of this request, the Supervisory Union Defendants respectfully submit the following Memorandum of Law.

## MEMORANDUM OF LAW

Vermont law requires that the state's schools adopt and enforce policies prohibiting the harassment of students by other students or school employees.  These policies, which are intended to ensure nondiscriminatory access to education and school programming, must be no less stringent than the model policy maintained by Defendant Interim Secretary of Education.  The Supervisory Union Defendants have adopted that model policy—and its accompanying procedures—nearly verbatim.  Plaintiff alleges that on its face, the definition of harassment created by the Legislature and included in those policies violates the First Amendment.  The Supervisory Union Defendants disagree and submit that under existing precedent, Defendants may constitutionally regulate speech by students or school employees that has the purpose or effect of denying a targeted student equal access to education and school resources on the basis of that student's association with a protected category such as race, religion, disability, or gender identity.

## I.   <u>Background</u>

At this juncture, suffice it to say that the Supervisory Union Defendants disagree with Plaintiff's accounting of the events leading up to his termination.  However, for purposes of this Motion to Dismiss Plaintiff's facial First Amendment challenges, the District Defendants summarize the following relevant allegations set forth in Plaintiff's Complaint and accompanying Exhibits.  *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996) (noting that on Rule 12(b)(6) motion, consideration limited to "facts stated in the complaint

or in documents attached to the complaint as exhibits or incorporated in the complaint by reference" (quotation omitted)).

Plaintiff is the former coach of the snowboarding team at Woodstock Union High School ("WUHS") within the Supervisory Union.  Complaint ¶¶ 1, 55.  As such, he was both subject to and responsible for implementing the Supervisory Union's Policies and Procedures for the Prevention of Harassment, Hazing, and Bullying.  Ex. 11 at 2, 5.  The Supervisory Union adopted the Policies and Procedures pursuant to Vermont law, 16 V.S.A. §§ 570, *et seq.*, which requires that educational institutions maintain policies for the prevention of harassment, hazing, and bullying no less stringent than model policies and procedures promulgated by Defendant Vermont Secretary of Education ("Model Policies and Procedures").  Complaint ¶¶ 140-41.  The Supervisory Union's Policies and Procedures are nearly identical to the Secretary's Model Policies and Procedures.  *Id.* ¶ 149; *see generally* Ex. 9-1.

The relevant Vermont law and the Model and Supervisory Union Policies and Procedures all prohibit, as relevant here, "the unlawful harassment of students."  Ex. 9 at 1; Ex. 11 at 1.  As set forth more fully *infra* section II.A, "harassment" is defined in the law, Model Policy, and Supervisory Union Policy as conduct both: (1) based on or motivated by a student's or a student's family member's actual or perceived membership in a protected category; and (2) engaged in with the purpose or effect of disrupting a student's access to school resources in one or more ways.  Complaint ¶¶ 148-49.  The protected categories are race, creed, color, national origin, marital status, sex, sexual orientation, gender identity, and disability.  *Id.*   A school on notice of student or employee conduct that may meet the definition of "harassment" must investigate and, if harassment is substantiated, "take prompt and appropriate remedial action reasonably calculated to stop the . . . harassment . . .; prevent its recurrence; and to remedy the impact of the offending

3

conduct on the victim(s), where appropriate." Complaint ¶¶ 150-151, 154. This remedial action may include terminating an employee. Ex. 10 at 5, Ex. 11 at 8.

On February 8, 2023, the WUHS snowboarding team—accompanied by Plaintiff as their coach—was waiting in a lodge for a competition to begin. *Id.* ¶¶ 5, 92. They were scheduled to compete against a team from another school district which included a transgender athlete. *Id.* ¶ 93. Consistent with her gender identity, that athlete would be participating in the women's division of the competition. *Id.* Plaintiff heard two members of his team discussing this and chose to interject. *Id.* ¶¶ 95, 99.

The following day, Plaintiff's employment as snowboarding coach was terminated. *Id.* ¶ 118. Superintendent Sousa presented Plaintiff with a formal notice of termination indicating that WUHS received a complaint that Plaintiff "had used disparaging terms to identify and describe a student on an opposing team" at the February 8 competition, and on inquiry, Plaintiff "confirmed that [he] made reference to the student in a manner that questioned the legitimacy and appropriateness of the student competing on the girls' team to members of the WUHS Snowboard Team." *Id.*; Ex. 8 at 2. The notice reflected Superintendent Sousa's conclusion that Plaintiff's "use of disparaging names created an objectively offensive environment and constituted harassment based on gender identity[.]" *Id.* As a result, Plaintiff's employment with the District was terminated based on his violation of the District's Policy for the Prevention of Harassment, Hazing, and Bullying as well as the Vermont Principals' Association Athletics Policy. *Id.* ¶ 118.

This suit followed. As relevant to this Motion, Plaintiff alleges that the definition of "harassment" under Vermont law and its implementing policies and procedures represents a facial violation of the First Amendment's prohibitions on content and viewpoint discrimination, prior restraint, and overbreadth. The District Defendants disagree, and respectfully submit that Plaintiff

has not alleged facts sufficient to maintain a facial challenge on any of these grounds because the harassment definition sweeps no more broadly than necessary to accomplish the government's compelling interest in preventing students in Vermont schools from suffering unequal access to education or school resources as a result of discriminatory conduct by peers or school employees.

## II.   <u>Argument</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The facial plausibility standard is satisfied only where the factual content in the pleadings "allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotations omitted).

Here, the Plaintiff alleges that the harassment definition in the law and its implementing policies and procedures facially violates the First Amendment on grounds of content and viewpoint discrimination, *see* Complaint ¶¶ 185-199, prior restraint, *see id.* ¶¶ 200-212, and overbreadth, *see id.* ¶¶ 213-223.  The Supervisory Union Defendants begin by analyzing the challenged definition in light of general First Amendment principles, and then address each facial challenge in turn. Because Plaintiff's conclusory recitation of First Amendment standards do not cross the plausibility threshold when considered in light of the plain language of the harassment definition, the Supervisory Union Defendants respectfully request that Plaintiff's facial First Amendment challenges be dismissed. *Ashcroft*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

**A.** **The challenged harassment definition does not exceed the broad authority of K-12 schools to regulate the speech of students and employees alike to,** *inter alia*, **prevent substantial disorder, material disruption of classwork, or substantial invasion of the rights of others.**

The first step in any facial First Amendment challenge is to construe the challenged enactment to ascertain its scope and determine its purpose. *See, e.g., Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165 (2015) (content-based); *United States v. Williams*, 553 U.S. 285, 293 (2008) (overbreadth); *Spirit of Aloha Temple v. County of Maui*, 49 F.4th 1180, 1188 (9th Cir. 2022) (prior restraint). To effectuate the doctrine of constitutional avoidance, this analysis must include consideration of "any limiting construction that a state court or law enforcement agency has proffered[,]" *see Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, n. 5 (1982), or to which the statute is "readily susceptible," *see Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988); *see also Bruni v. City of Pittsburgh*, 941 F.3d 73, 85 (3d Cir. 2019) ("[U]nder the doctrine of constitutional avoidance, it has long been a tenant of First Amendment law that in determining a facial challenge to a statute, if it be readily susceptible to a narrowing construction that would make it constitutional, it will be upheld." (quotations and brackets omitted)).

The challenges at issue in this motion are levied at the way the law, policies, and procedures define "harassment." Both the model and Supervisory Union policies take the definition of harassment directly from Title 16, *see* Complaint ¶¶ 148-149. Given the nature of Plaintiff's challenges, it is necessary to reproduce that definition here in full:

> (A) "Harassment" means an incident or incidents of verbal, written, visual, or physical conduct, including any incident conducted by electronic means, based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status, sex, sexual orientation, gender identity, or disability that has the purpose or effect of objectively and substantially undermining and detracting from

6

or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment.

(B) "Harassment" includes conduct that violates subdivision (A) of this subdivision (26) and constitutes one or more of the following:

(i) Sexual harassment, which means conduct that includes unwelcome sexual advances, requests for sexual favors and other verbal, written, visual, or physical conduct of a sexual nature when one or both of the following occur:

(I) Submission to that conduct is made either explicitly or implicitly a term or condition of a student's education.

(II) Submission to or rejection of such conduct by a student is used as a component of the basis for decisions affecting that student.

(ii) Racial harassment, which means conduct directed at the characteristics of a student's or a student's family member's actual or perceived race or color, and includes the use of epithets, stereotypes, racial slurs, comments, insults, derogatory remarks, gestures, threats, graffiti, display, or circulation of written or visual material, and taunts on manner of speech and negative references to racial customs.

(iii) Harassment of members of other protected categories, which means conduct directed at the characteristics of a student's or a student's family member's actual or perceived creed, national origin, marital status, sex, sexual orientation, gender identity, or disability and includes the use of epithets, stereotypes, slurs, comments, insults, derogatory remarks, gestures, threats, graffiti, display, or circulation of written or visual material, taunts on manner of speech, and negative references to customs related to any of these protected categories.

16 V.S.A. § 11(a)(26). Whether conduct constitutes harassment is to be determined "based on all the facts and surrounding circumstances." Ex. 10 at 4; Ex. 11 at 7.

The Model Policy—and therefore the Supervisory Union Policy—also reflect the Secretary's intent that school officials read the harassment definition no more broadly than

comports with the First Amendment.[2]   Both Policies provide that the intent of the implementing

District is to apply and enforce the Policy in a manner consistent with the rights guaranteed by the

First Amendment to the United States Constitution, specifically noting the Policy's purpose is to

"prohibit conduct or communication that is directed at a person's protected characteristics as

defined below and that has the purpose or effect of substantially disrupting the educational learning

process and/or access to educational resources or creates a hostile learning environment[.]"  Ex.

11 at 2, Supervisory Union Defendants' Ex. A at 2.   This provision functions as Defendant

Secretary's limiting construction of the harassment definition at § 11(a)(26), which must therefore

be considered by the court in evaluating Plaintiff's facial challenge.  *See Vill. of Hoffman Estates*,

455 U.S. at 494, n. 5 ("In evaluating a facial challenge to a state law, a federal court must, of

course, consider any limiting construction that a state court or enforcement agency has

proffered.").

    "Harassment," then, is conduct which is based on or motivated by a student's association

with a protected class *and* has the purpose or effect of interfering with educational access in a

number of proscribed ways, with that interference being measured under an objective test.  *Id.*

§ 11(a)(26)(A).   Subsection (B) provides examples of types of conduct which may constitute

harassment—but only where the freestanding requirements of subsection (A) have first been

satisfied.  *Id.* § 11(a)(26)(B).   Moreover, school administrators are constrained to apply the

---

[2]  In what the Supervisory Union Defendants will assume was merely a particularly unfortunate oversight, the page of the Model Policy including this provision was omitted from the Exhibit 9 to Plaintiff's Complaint. *Compare* Ex. 9 to Plaintiff's Complaint (missing page 2) *with* State of Vermont Agency of Education's Model Policy on the Prevention of Harassment, Hazing and Bullying of Students, available at https://education.vermont. gov/documents/healthy-safe-schools-hhb-model-policy (last accessed August 28, 2023) at page 2.  For ease of reference, the Supervisory Union Defendants have filed a true and correct copy of the Model Policy herewith as Exhibit A and submit that the court may consider it because it is incorporated by reference in the Complaint. *See* Newman, 102 F.3d at 662.  Alternatively, the Supervisory Union Defendants submit that the court may take judicial notice of the complete version of the Model Policy as a fact not subject to reasonable dispute because it can be accurately and readily determined from the Agency of Education's website, a source whose accuracy cannot reasonably be questioned.  F.R.E. 201(b)(2).

definition only within the bounds of what the First Amendment allows: speech which cannot be regulated under the First Amendment cannot be harassment.

Turning from the definition's scope to its purpose, the Supervisory Union Defendants note that the Vermont Legislature has been exceedingly clear about the reason that harassment, thus defined, is proscribed:

> It is the policy of the State of Vermont that all Vermont educational institutions provide safe, orderly, civil, and positive learning environments. Harassment, hazing, and bullying have no place and will not be tolerated in Vermont schools. No Vermont student should feel threatened or be discriminated against while enrolled in a Vermont school.

16 V.S.A. § 570(a). Indeed, as the Model and Supervisory Union Policies recognize, such harassment may separately violate civil rights statutes such as Vermont's Public Accommodation Act ("the VPAA"), Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act of 1990, the Age Discrimination Act of 1975, and/or Title IX of the Education Amendments Act of 1972. Ex. 9 at 1; Ex. 11 at 1. The VPAA is particularly pertinent to the construction of the harassment definition because when it passed the law adopting § 11(a)(26)'s harassment definition and requiring that schools maintain harassment policies, the Legislature "intended to implement the provisions of [the VPAA] as they affect schools as places of public accommodation."[3] *Washington v. Pierce*, 2005 VT 125, ¶ 18,

---

[3] In interpreting these provisions for the first time, the Vermont Supreme Court took care to note the following:

> A school administration's power over its students is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (recognizing that school officials have "comprehensive authority" over students, " consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools"). This authority necessarily places a responsibility on school administrators to exercise their power so as to provide their charges with an atmosphere conducive to education and personal growth, free from impediments

9

179 Vt. 318, 895 A.2d 173 (quoting 1993, No. 162 (Adj. Sess.), § 1).  The Legislature's stated purpose was "to protect students by defining unlawful harassment as a form of discrimination which withholds from or denies to a student the accommodations, advantages, facilities, and privileges of the school."  1993, No. 162 (Adj. Sess.), § 1.

As relevant here, the VPAA prohibits operators of places of public accommodation, such as schools, to "refuse, withhold from, or deny to [a] person any of the accommodations, advantages, facilities, and privileges of the place of public accommodation" "because of" that person's membership in a protected class.  9 V.S.A. § 4502(a), *see also id.* 4501(1) ("'Place of public accommodation' means any school . . . .").  "Thus, the definition of harassment in 16 V.S.A. § 11(a)(26) mirrors the VPAA's definition of unlawful conduct in the context of harassment in schools." *Washington*, 2005 VT 125, ¶ 20.  Where a school fails to comply with the antiharassment provisions of Title 16, it may be subject to liability under the VPAA.  16 V.S.A. 570f(b).  The Legislature's intent is clear: the challenged provisions of Title 16 are intended to effectuate the VPAA's guarantee of nondiscriminatory access to Vermont schools, recognizing that conduct meeting the definition of harassment works a denial of the equal access those schools must afford all students.  *See, e.g., Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998) (recognizing that in school context, sexual harassment can constitute sex discrimination under Title IX).  An examination of federal case law compels the conclusion that this is precisely the type of speech which schools may constitutionally regulate.

---

like pervasive student misbehavior. Not surprisingly, the Legislature has explicitly recognized that "it is the policy of the state of Vermont that all Vermont educational institutions provide safe, orderly, civil and positive learning environments." 1999, No. 120 (Adj.Sess.), § 1.
*Washington*, 2005 VT 125, ¶ 18.  The Court's citation to *Tinker* in this context certainly does not suggest that the Vermont Supreme Court harbored any reservations about the permissibility of the challenged provisions of Title 16 under the First Amendment.  *See id.*

As the Vermont Supreme Court recognized in interpreting the challenged provisions of Title 16, *see Washington*, 2005 VT 125, ¶ 18, in the K-12 context, the United States Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 507 (1969); *see also Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."); *see also Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 238 n. 4 (2000) (Souter, J., concurring) (observing that Supreme Court "cases dealing with the right of teaching institutions to limit expressive freedom of students has been confined to high schools, whose students and their schools' relation to them are different and at least arguably distinguishable from their counterparts in college education" (citations omitted)); *East Harford Ed. Ass'n v. Bd. of Ed. of Town of East Hartford*, 562 F.2d 838, 843 (2d Cir. 1977) (noting unique primacy in K-12 context of "countervailing interests of states, acting through local school boards, to inculcate basic community values in students who may not be mature enough to deal with academic freedom as understood or practiced at higher educational levels").

It is thus "well settled that K-12 schools, under certain circumstances, may regulate the content of student speech, including offensive speech, that would otherwise be protected if uttered or displayed by a member of the general public." *Radwan v. Manuel*, 55 F.4th 101, 115 (2d Cir. 2022) (concluding that college did not violate First Amendment when regulating student's "ability to display a vulgar or offensive gesture as an athlete on the university's sports team, wearing the university's jersey, during a university sports event"). School officials may regulate speech—even

on the basis of content or viewpoint—that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker*, 393 U.S. at 506 (noting that regulation forbidding discussion of Vietnam conflict or expression of opposition to same on school property except as part of classroom exercise could not be imposed by school officials "*if* it could not be justified that the students' activities would materially and substantially disrupt the work and discipline of the school" (emphasis added)).

An intent to legislate within the bounds of these principles is apparent in the statute, which deems harassment only such conduct as materially invades the rights of students under the VPAA as well as other civil rights statutes—which is, not coincidentally, only that speech which has the purpose or effect of objectively impeding a student's educational access. The same intent is evinced in the Model and Supervisory Union Policies, which each provide that their purpose is to "prohibit conduct or communication that is directed at a person's protected characteristics as defined below and that has the purpose or effect of substantially disrupting the educational learning process and/or access to educational resources or creates a hostile learning environment[.]" Ex. 11 at 2, Supervisory Union Defendants' Ex. A at 2.

Further, "the rule of *Tinker* is not the only basis for restricting student speech[.]" *Morse v. Frederick*, 551 U.S. 393, 406. The Court has also held it "perfectly appropriate for [a] school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 665-86 (1986). Likewise, in holding that high school officials acted consistently with the First Amendment when they censored articles in a school newspaper about pregnancy and divorce on grounds that they could be perceived to "bear the imprimatur of the school[,]" the Court observed:

> a school may in its capacity as publisher of a school newspaper or
> producer of a school play disassociate itself, not only
> from speech that would substantially interfere with its work or
> impinge upon the rights of other students, but also from speech that
> is, for example, ungrammatical, poorly written, inadequately
> researched, biased or prejudiced, vulgar or profane, or unsuitable for
> immature audiences.

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271-72 (1988). Schools may also, "consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Morse v. Frederick*, 551 U.S. 393, 406.  In sum, a school "need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school.' " *Hazelwood*, 484 U.S. at 266-67 ("The determination of what manner of speech . . . is inappropriate properly rests with the school board rather than with the federal courts." (quotation omitted)).

These concepts buttress the conclusion set forth above because the harassment law, policies, and procedures are, fundamentally, a mechanism to "dissociate" the school from conduct that is harassing by taking steps to remediate harm and prevent a reoccurrence—because such conduct is "wholly inconsistent with the 'fundamental values' of public school education." *See Fraser*, 478 U.S. at 665-86 (1986).  Indeed, that is precisely what the civil rights statutes cited in the Policies recognize: because a school bears ultimate responsibility for the learning environment afforded to its students, where a school knows of conduct—whether by employees or students— that is harassing in nature, and the school fails to take appropriate steps to remediate the harm and prevent its reoccurrence, then the harassing conduct thus tolerated and allowed to persist "bears the imprimatur of the school" and gives rise to a claim against it.  *See Hazelwood*, 484 U.S. at 271-72.

Likewise, schools have latitude to regulate the speech of their employees under the circumstances contemplated by the harassment definition. Broadly speaking, "[s]peech by government employees receives less protection than speech by members of the public." *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95, 103 (3d Cir. 2022). And, like student-speech doctrines, in the context of schools, "public employee speech doctrine recognize[s] that the scope of the government's authority to regulate speech within its institutions depends upon the objectives those institutions are designed to achieve." *Oyama v. Univ. of Haw.*, 813 F.3d 850, 869 (9th Cir. 2015) ("To fulfill its responsibilities to the public," under state teacher-certification law, "the University may evaluate a candidate's suitability for teaching based, in part, on his or her speech."); *see also City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004) (holding that public employer may regulate speech to "protect its own legitimate interests in performing its mission"). This is so because "[i]n addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Kennedy v. Bremerton Sch. Dist.*, ___ U.S. ___, 142 S.Ct. 2407, 2423 (2022); *see also Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.").

The government has a paramount interest in ensuring that students are not denied equal access to education or school programming by unchecked harassing student or employee conduct directed at a student's association with a protected category. "As the Court has long held, "[i]t is

evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' " is not just substantial, but " 'compelling.' " *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 595, 607 (1982)); *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944) ("A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens."). As a result, the Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Ferber*, 458 U.S. at 757; *see also Ginsberg v. State of New York*, 390 U.S. 629, 636-37 (1968) (concluding that statute barring sale of obscene materials to individuals under seventeen did not violate First Amendment); *Prince*, 321 U.S. at 168 (holding statute prohibiting use of child to distribute literature in street valid notwithstanding statute's effect on a First Amendment activity). And, as long ago as *Brown v. Board of Education*, the Court recognized that "[a] sense of inferiority affects the motivation of a child to learn." 347 U.S. 483, 494 (1954). The challenged definition, by requiring that regulated conduct be both based on or motivated by a student's or a student's family member's association with a protected class *and* perpetrated with the purpose or effect of working a denial of equal access, is narrowly tailored to further the state's compelling interest in ensuring that no student be denied equal access on those grounds.

Undergirding the holdings of these First Amendment cases in the K-12 context is the status of students as a quintessentially captive audience possessed of a privacy interest in avoiding unwanted communications. *Fraser*, 478 U.S. at 684 (collecting cases "recogniz[ing] the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech");

*Katz v. McAulay*, 438 F.2d 1058, 1061 (2d Cir. 1971) (applying captive audience doctrine in public school students' First Amendment challenge to rule prohibiting solicitation of funds from public school students because "[p]upils are on school premises in response to the statutory requirement that they attend school for the purpose of formal education").  The "right to be let alone" is recognized by the Court as " 'the most comprehensive of rights and the right most valued by civilized men,' " *see Hill v. Colorado*, 530 U.S. 703, 716-17 (2000) (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)), and this "recognizable privacy interest in avoiding unwanted communication" reaches its zenith "when persons are 'powerless to avoid' " the communications in question, *see id.* (quoting *Cohen v. California*, 403 U.S. 15, 21-22 (1971)).  As stated by Justice Stewart,

> [The First Amendment] secures as well the liberty of each man to decide for himself what he will read and to what he will listen.  The Constitution guarantees, in short, a society of free choice.  Such a society presupposes the capacity of its members to choose.
>
> When expression occurs in a setting where the capacity to make a choice is absent, government regulation of that expression may co-exist with and even implement First Amendment guarantees.

*Ginsberg v. State of New York*, 390 U.S. 629, 649-50 (1968) (Stewart, J., concurring).

Thus, "the protection afforded to offensive messages" may not "embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it[,]" and the Court's cases "have repeatedly recognized the interests of unwilling listeners in situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure."  *Hill*, 530 U.S. at 716, 718 (quotations omitted).  In such cases—and as set forth in greater detail in response to Plaintiff's content- and viewpoint-based discrimination challenge, "[i]t may not be the content of the speech, as much as the deliberate 'verbal or visual assault,' that justifies proscription."  *Erznoznik v. Jacksonville*, 422 U.S. 205, 210-11, n. 6 (1975) (citation and brackets omitted).

Against this backdrop, the Supervisory Union Defendants address each of Plaintiff's facial First Amendment challenges in turn.

**B.      Plaintiff fails to state a claim that the harassment definition is facially unconstitutional on grounds of content- and viewpoint-discrimination because the purpose of the enactments at issue is to regulate not the content of the speech, but its *secondary effects* on the school environment.**

Plaintiff's second cause of action alleges that the harassment definition violates the First Amendment's prohibition on content and viewpoint discrimination by singling out speech based on or motivated by a student's or student's family member's protected categories and including "epithets, stereotypes, slurs, . . . insults, derogatory remarks, . . . and negative references to customs" as examples of conduct that could meet the definition of harassment. He further alleges that the definition does not contain guidelines sufficient to prevent government officials from exercising unbridled discretion to target speech whose content and viewpoints they disagree with.

It is important to first note that Plaintiff's pleading elides an essential provision of the harassment definition: neither the basis nor motivation underlying speech, nor its classification as one of any various listed types, has any significance in a harassment analysis if the speech is not also found to have the purpose or effect of objectively impeding access to school programming in some way. 16 V.S.A. § 11(a)(26). Thus, an insult or epithet that does not satisfy the requirements of § 11(a)(26)(A) is not "harassment" as defined by the law or policies; to the extent that Plaintiff intended to assert as much, that assertion fails in light of the statute's plain language: a school may constitutionally prohibit speech, even where the result is content or viewpoint discrimination, if that speech violates the rights of other students or presents a material disruption. *See Tinker*, 393 U.S. at 511 (holding probation of expression of one particular opinion constitutionally impermissible "without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline"); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 (5th Cir.

2004) (noting *Tinker* "applies to school regulations directed at specific student viewpoints"); J.M. Balkin, *Free Speech and Hostile Environments*, 99 Colum. L. Rev. 2295, 2318 (1999) ("If status-based harms are to be protected at all, some content-based and even viewpoint-based distinctions are inevitable.").  Correctly applied, the impact provision of the harassment definition ensures that the policy is not applied to speech not regulable under *Tinker*.

The permissibility under *Tinker* of rules targeting the *effect*—rather than the content or viewpoint—of speech is consistent with cases outside the school context.  In *Wisconsin v. Mitchell*, the Court was confronted with a First Amendment challenge to a sentence enhancement applied to a criminal defendant found to have selected the victim of his crime on the basis of race.  508 U.S. 476, 479 (1993).  It held that though the statute "enhance[d] the maximum penalty for conduct motivated by a discriminatory point of view more severely than the same conduct engaged in for some other reason or for no reason at all[,]" it was not constitutionally infirm, analogizing to federal and state antidiscrimination laws previously upheld against First Amendment challenge. *Id.* at 485-87 (collecting cases).  So though the Wisconsin statute at issue "single[d] out for enhancement bias-inspired conduct because this conduct is thought to inflict greater individual and societal harm . . . . [t]he State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases." *Id.* at 487-88.

Likewise, in *City of Renton v. Playtime Theatres, Inc.*, the Court reasoned that a moratorium on licensing businesses with a primary purpose of renting, selling, or showing sexually explicit materials because of the impact on surrounding businesses and residences—for all that the ordinance "treat[ed] theaters that specialize in adult films differently from other kinds of theaters"—did not run afoul of the First Amendment's limits on content-based speech.  475 U.S.

41, 47 (1986).  This was so, the Court held, because the ordinance took aim "not at the *content* of the films shown at 'adult motion picture theaters,' but rather at the *secondary effects* of such theaters on the surrounding community." *Id.*   As a result, the ordinance was deemed "completely consistent" with the Court's "definition of 'content-neutral' speech regulations as those that 'are *justified* without reference to the content of the regulated speech.' "  *Id.* at 48 (quoting *Virginia Pharm. Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)).

So too here.  The harassment law requires schools to regulate expressive conduct which has the purpose or effect of denying students equal access to education or school activities on the basis of the student's or the student's family member's membership in a protected class.  It is not the content or viewpoint of the speech in question, but instead its *secondary effects*—namely, the denial of equal access to schools on  the basis of membership in a protected category—which the Vermont Legislature sought to regulate.  *See Renton*, 475 U.S. at 47.

Nor does the definition afford school administrators unbridled discretion to determine whether conduct constitutes harassment.  "Condemned to the use of words, we can never expect mathematical certainty in our language[.]"  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).  To be sure, the standards at issue are "undoubtedly flexible, and the officials implementing them will exercise considerable discretion"; however, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (rejecting facial content-discrimination challenge to sound-amplification guideline for city bandshell).  Both the law and policies at issue here contain substantial guardrails to ensure school officials do not exercise unfettered discretion in their enforcement.  Just as the sound-amplification guideline challenged in *Ward* was, "[b]y its own terms," to "be interpreted to forbid city officials purposely to select inadequate sounds systems or to vary the sound quality or

volume based on the message being delivered by performers," school administrators charged with the administration of the policies in question must, by the terms of those same policies, implement them in a way that is consistent with the First Amendment. *Ward*, 491 U.S. at 795 ("The guideline is not vulnerable to respondent's facial challenge.")

Plaintiff's claim that the harassment definition facially violates the First Amendment on grounds of content and viewpoint discrimination does not satisfy the plausibility standard. The definition in question is satisfied only where the type of secondary effects a school may permissibly regulate—invasion of the rights of others, substantial disruption of classwork and the school environment—are intended or existent, and the definition is not to be construed to violate the First Amendment. As a result, the definition falls well within the grant of authority recognized in *Tinker*.

> **C.    Plaintiff fails to state a claim that the harassment definition is a prior restraint on employee speech because the harassment definition is by its own terms limited to speech based on or motivated by a student's association with a protected category—which is not a matter of public concern.**

Plaintiff next alleges that that the harassment definition facially violates the First Amendment because prohibiting harassment functions as a prior restraint on speech made by school employees as private citizens on matters of public concern. However, even passing consideration of the relevant cases involving employee speech demonstrate that this claim is not facially plausible.

The First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern[,]" but has no application to "speech that owes its existence to a public employee's professional responsibilities." *Garcetti*, 547 U.S. at 417, 421. "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject

of general interest and of value and concern to the public[.]"  *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83-34 (2004). However, the harassment definition governs only employee speech which is "based on or motivated by a student's or a student's family member's" membership in a protected category.  Speech based on or motivated by a student's association with a protected category is unequivocally not a matter of public concern—indeed, federal student privacy law is likely to prohibit a school employee's public disclosure of such information. *See* 34 C.F.R. § 99.30(a) (providing that educational agency or institution may not disclose personally identifiable information from a student's education records in the absence of written consent).

And even if the definition could, in some circumstances, be interpreted to regulate speech touching on a matter of public concern, schools nonetheless have the ability to regulate employee speech which has the purpose or effect of disrupting student's access to education or school programming because it undermines the school's fundamental responsibility to provide nondiscriminatory access.  For example, in *Locurto v. Giuliani*, the Second Circuit entertained a First Amendment challenge to the termination of a police officer and two firefighters after they participated in a racially offensive parade float.  447 F.3d 159 (2006).  The court found that the City was motivated to terminate the plaintiffs out of "concern for the potential disruption [their] activities would case to the NYPD and FDNY, in particular by engendering and perpetuating a public perception of those Departments as racially insensitive." *Id.* at 182.  It concluded that although the plaintiffs spoke on matters of public concern,

> the defendants' interest in maintaining a relationship of trust between the police and fire departments and the communities they serve outweighed the plaintiffs' expressive interests in this case.  If the NYPD and FDNY have any greater interests than these, they are few.  And the speech at issue in this case was not merely of passing interest to members of the African-American community; rather, they were the very objects of the plaintiffs' derision.  *The First Amendment does not require a government employer to sit idly by*

> *while its employees insult those they are hired to serve and protect.*
> Under the circumstances, an individual [employee's] right to
> express his personal opinions must yield to the public good.

*Id.* at 183 (citations and quotation omitted) (emphasis added).  Just so here.

Because the harassment definition, when correctly interpreted, cannot encompass a school
employee's private speech on matter of public concern, and because the First Amendment does
not require a school to sit idly by while its employees harass the students they are hired to educate,
Plaintiff has failed to state a claim that it facially violates the First Amendment's prohibition on
prior restraints.

> **D.    Plaintiff fails to state a claim that the harassment definition is facially
> overbroad because it does not reach a substantial amount of constitutionally
> protected speech in relation to its plainly legitimate sweep.**

Finally, Plaintiff alleges that the HHB law, policies, and procedures are facially overbroad
because the definition of "harassment" allegedly "reaches a substantial amount of constitutionally
protected speech in relation to any plainly legitimate sweep."  Complaint ¶ 215.  Specifically,
Plaintiff argues that the definition of harassment is overbroad because it is not limited to conduct
"so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an
educational opportunity or benefit."  Complaint ¶ 220.  This argument fails because the First
Amendment does not require that access to educational opportunities or benefits be effectively
barred by disruptive conduct before a school can take action to prevent such disruption.

 "The overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last
resort.' "  *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (quoting
*Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).  "In the First Amendment context," a law may
be invalidated as facially overbroad only where " 'a substantial number of its applications are
unconstitutional, judged in relation to the statute's plainly legitimate sweep.' "  *United States v.*

*Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)).  Thus, in a facial overbreadth challenge, "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Estates*, 455 U.S. at 494.  "If it does not, then the overbreadth challenge must fail." *Id.* "[T]he mere fact that one can conceive of some impermissible applications of [an enactment] is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).  Rather, "there must be a realistic danger that the [enactment] itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* at 801 (citations omitted).  Where a plaintiff fails to make this showing, courts "cannot conclude" that the challenged law, regulation, or policy is substantially overbroad, and must instead "assume that whatever overbreadth may exist should be cured by a case-by-case analysis of the fact situations to which its sanctions, assuredly, may not be applied." *New York State Club Ass'n*, 487 U.S. at 14 & n. 5 (noting that "[i]n making this case-by-case inquiry into the constitutionality of [an amendment to New York City's Human Rights Law] as applied to particular associations, it is relevant to note that the Court has recognized the State's compelling interest in combatting invidious discrimination" (quotations omitted)).

Plaintiff's suggestion that the harassment definition is overbroad because it is not limited to conduct so severe, pervasive, and objectively offensive as to effectively deny equal access is unfounded.  This language is presumably derived from *Davis as Next Friend of Lashonda D. v. Monroe County Board of Education*, in which the Court held that a private damages action may lie against a school board under Title IX for student-on-student harassment only where the board acts with deliberate indifference to known harassment within its programs or activities which "is

23

so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."  526 U.S. 629, 633 (1999).  As one District Court recently recognized in considering the same argument presented in an overbreadth challenge to a school harassment policy, "[i]t does not follow . . . that the same high standard for when a school board can be held liable for failing to prevent student-on-student harassment should also dictate when a school may institute policies to restrict such harassment."  *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, no. 2:23-cv-01595, 2023 WL 4848509 at * 10 (S.D. Ohio July 28, 2023).  In *Oletangy*, the court considered *Fraser*, *Hazelwood*, and *Morse*, noting that under those cases, schools may regulate many types of speech where there is no suggestion that there was "no suggestion that the schools in these cases would have been exposed to liability for failing to promote the habits and manners of civility, to awaken students to cultural values, or to protect students from restriction," but they were nonetheless permitted to restrict the subject speech.  *Id.* The court concluded that "a school's restriction on speech that creates a hostile environment need not be tied to the *Davis* standard for Title IX liability . . . to meet the substantial disruption requirement of *Tinker*."  *Id.* at *10-11.

Indeed, the state's interest in ensuring that students are not denied equal access to schools on the basis of their association with a protected category would be ill-served if the school had the ability to regulate conduct which could work such a denial only *after* access had in fact been denied.  This is precisely why *Tinker* does not require a disruption to have actually occurred before speech may be regulated—"requiring evidence of disruption caused by the banned speech would place school officials . . . between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation."  *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008) (quotation omitted).  The same reasoning applies with equal force to speech which

24

interrupts classwork and invades the rights of others within the meaning of *Tinker*—schools need not suffer a student's learning to be interrupted or her rights to be invaded by harassing conduct to the extent that equal access is "effectively denied" before speech may be regulated.

For the reasons set forth above, Plaintiff has not plausibly alleged that the harassment definition is facially overbroad.  There is no cause for the "strong medicine" of the overbreadth doctrine to be invoked here.

**III.**   **Conclusion**

For the foregoing reasons, the Supervisory Union Defendants respectfully request Plaintiff's facial content- and viewpoint restriction, prior restraint, and overbreadth challenges be dismissed for failure to state a claim upon which relief may be granted.

Dated at Burlington, Vermont, this 1st day of September, 2023.

WINDSOR CENTRAL SUPERVISORY
UNION BOARD & SHERRY SOUSA

By:   */s/ Pietro J. Lynn*
       Pietro J. Lynn, Esq.
       Sean M. Toohey, Esq.
       Lynn, Lynn, Blackman & Manitsky, P.C.
       *Attorneys for Defendants Windsor Central*
       *Supervisory Union Board & Sherry Sousa*
       76 St. Paul Street, Suite 400
       Burlington, VT 05401
       (802) 860-1500
       plynn@lynnlawvt.com
       stoohey@lynnlawvt.com