UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 DEC 28  PM 5: 07

BY _____
DEPUTY CLERK

DAVID J. BLOCH,                              )
                                               )
          Plaintiff,                      )
                                               )
    v.                                      )       Case No. 2:23-cv-00209
                                               )
HEATHER BOUCHEY, in her official capacity )
as Interim Secretary of the Vermont Agency of )
Education; JAY NICHOLS, in his official      )
capacity as Executive Director of the Vermont )
Principals' Association; WINDSOR             )
CENTRAL SUPERVISORY UNION                    )
BOARD; and SHERRY SOUSA, in her official )
and individual capacities as Superintendent of )
Windsor Central Supervisory Union,           )
                                               )
          Defendants.                     )

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION, GRANTING IN PART AND DENYING IN PART
DEFENDANT HEATHER BOUCHEY'S MOTION TO DISMISS, GRANTING IN
PART AND DENYING IN PART THE SCHOOL BOARD DEFENDANTS'
MOTION TO DISMISS, AND GRANTING IN PART AND DENYING IN PART
DEFENDANT JAY NICHOLS'S MOTION TO DISMISS**
(Docs. 2, 29, 34, & 37)

      Plaintiff David J. Bloch brings this action under 42 U.S.C. § 1983 against

Defendants Heather Bouchey ("Secretary Bouchey"), in her official capacity as Interim

Secretary of the Vermont Agency of Education; Jay Nichols ("Executive Director

Nichols"), in his official capacity as Executive Director of the Vermont Principals'

Association (the "VPA"); and the Windsor Central Supervisory Union Board (the

"Board") and Sherry Sousa ("Superintendent Sousa"), in her official and individual

capacities as Superintendent of Windsor Central Supervisory Union (the "School

District"), (collectively, the "School Board Defendants").

He alleges his free speech and procedural due process rights were violated by his termination as head coach of the Woodstock Union High School ("Woodstock H.S.") snowboarding team for certain statements he made during an interscholastic athletic competition. He challenges Defendants' respective policies and procedures governing hazing, harassment, and bullying, arguing these policies violate the First Amendment right to freedom of speech both facially and as applied to him. Plaintiff seeks injunctive and declaratory relief, monetary damages, and an award of attorney's fees under 42 U.S.C. § 1988.

## I.     Procedural Background.

On July 17, 2023, Plaintiff filed a Verified Complaint (the "Verified Complaint") for injunctive and declaratory relief (Doc. 1) and a motion for a preliminary injunction (Doc. 2). He requested an expedited hearing.[1] The Verified Complaint alleges Defendants violated Plaintiff's right to free speech under the First and Fourteenth Amendments to the United States Constitution by: retaliating against him for expressing his views (Count I); discriminating against his speech based on its content and viewpoint (Count II); imposing prior restraints on his speech (Count III); and promulgating facially overbroad restraints on speech (Count IV). Plaintiff asserts a procedural due process claim and a void for vagueness claim pursuant to the Fourteenth Amendment (Count V).

Plaintiff's motion for a preliminary injunction requests the court to order:

Defendants to reinstate [Plaintiff] as snowboarding coach; refrain from enforcing their ban on considering him "for any future coaching positions"; and purge from any records in their possession, custody, or control any reference to his termination as snowboarding coach[.]

(Doc. 2 at 2.) He also requests the court to enjoin:

enforcement of Defendants' [harassment, hazing, and bullying] law, policies, and procedures [in so far] as they prohibit (i) "harassment" that is not so severe, pervasive, and objectively offensive that it effectively bars a student's access to an educational benefit, (ii) expressing views on differences in and the immutability of sex and the appropriateness of a teenage male competing against teenage females in an athletic competition,

---

[1] Plaintiff filed a motion for limited expedited discovery on August 30, 2023 (Doc. 25) but opted instead for an expedited hearing.

and (iii) referring to a male as a male.

*Id.*

On August 31, 2023, oppositions to Plaintiff's motion were filed by Executive Director Nichols (Doc. 27) and Secretary Bouchey (Doc. 31). On September 1, 2023, the School Board Defendants opposed Plaintiff's motion (Doc. 35). Plaintiff replied to all three oppositions on September 14, 2023 (Doc. 44).

On August 31, 2023, Secretary Bouchey moved to dismiss Plaintiff's Verified Complaint against her for lack of standing and failure to state a claim (Doc. 29). On September 1, 2023, the School Board Defendants moved to dismiss Plaintiff's facial challenges under the First Amendment for failure to state a claim (Doc. 34). On September 8, 2023, Executive Director Nichols moved to dismiss Plaintiff's Verified Complaint for lack of standing and failure to state a claim (Doc. 37).

The court held an evidentiary hearing on Plaintiff's motion for a preliminary injunction on September 25, 2023 and, with the parties' consent, deferred deciding the preliminary injunction motion until the motions to dismiss were ripe for adjudication.

Plaintiff opposed all three motions to dismiss on September 29, 2023 (Doc. 56). On October 13, 2023, Secretary Bouchey (Doc. 65), the School Board Defendants (Doc. 63), and Executive Director Nichols (Doc. 64) filed replies, at which point the court took the motion for a preliminary injunction and the motions to dismiss under advisement.

Plaintiff is represented by Anthony R. Duprey, Esq., David A. Cortman, Esq., Mathew W. Hoffmann, Esq., and Tyson C. Langhofer, Esq. Secretary Bouchey is represented by Kate T. Gallagher, Esq., and Jaime B. Kraybill, Esq. Executive Director Nichols is represented by Steven J. Zakrzewski, Esq. The School Board Defendants are represented by Pietro J. Lynn, Esq., and Sean M. Toohey, Esq.

## II.    Motions to Dismiss.

Secretary Bouchey and Executive Director Nichols argue that Plaintiff lacks standing to bring his claims against them because their respective policies did not cause his termination, they had no involvement in Plaintiff's termination, and they lack the ability to reinstate him. Secretary Bouchey, the School Board Defendants, and Executive

Director Nichols request dismissal of Plaintiff's First Amendment claims against them for content discrimination (Count II), prior restraint (Count III), and overbreadth (Count IV), and his Fourteenth Amendment claim that their policies are void for vagueness (Count V) for failure to state a claim for which relief may be granted.

### A.    Harassment, Hazing, and Bullying Prevention Policies.

The Vermont Secretary of Education's duties include "[s]upervis[ing] and direct[ing] the execution of the laws relating to the public schools and ensur[ing] compliance[,]" 16 V.S.A. § 212(5), and "[s]upervis[ing] the expenditure and distribution of all money appropriated by the State under the provisions of [Title 16] for public schools[,]" *id.* § 212(6). The Verified Complaint asserts the Secretary of Education can withhold funding from school districts that violate Vermont law. *See id.* § 4003(a) ("No school district shall receive any aid under this chapter unless that school district complies with . . . requirements of law."). Vermont law provides:

> It is the policy of the State of Vermont that all Vermont educational institutions provide safe, orderly, civil, and positive learning environments. Harassment, hazing, and bullying have no place and will not be tolerated in Vermont schools. No Vermont student should feel threatened or be discriminated against while enrolled in a Vermont school.

*Id.* § 570(a).

The Secretary of Education is required to "develop and . . . update model harassment, hazing, and bullying prevention policies[,]" *id.* § 570(d)(1), and every "school board" must develop, adopt, and enforce "harassment, hazing, and bullying prevention policies that shall be at least as stringent as model policies developed by the Secretary[]" ("HHB Policies"), *id.* § 570(b). HHB Policies must include "[a] statement that harassment, as defined in subdivision 11(a)(26) of [Title 16], is prohibited and may constitute a violation of the public accommodations act" and "[c]onsequences and appropriate remedial action for staff or students who commit harassment." 16 V.S.A. § 570a(a)(1)-(2).

Subdivision 11(a)(26)(A) of Title 16 defines "harassment" as:

an incident or incidents of verbal, written, visual, or physical conduct, including any incident conducted by electronic means, based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status, sex, sexual orientation, gender identity, or disability that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile, or offensive environment.

*Id.* § 11(a)(26)(A). "Harassment" also

includes conduct that violates subdivision (A) of [16 V.S.A. § 11(a)(26)] and constitutes . . . [h]arassment of members of other protected categories, which means conduct directed at the characteristics of a student's or a student's family member's actual or perceived creed, national origin, marital status, sex, sexual orientation, gender identity, or disability and includes the use of epithets, stereotypes, slurs, comments, insults, derogatory remarks, gestures, threats, graffiti, display, or circulation of written or visual material, taunts on manner of speech, and negative references to customs related to any of these protected categories.

*Id.* § 11(a)(26)(B)(iii).

Secretary Bouchey promulgated a model harassment, hazing, and bullying prevention policy (the "Model HHB Policy") and model procedures (the "Model HHB Procedures") to guide Vermont schools.[2] It is her responsibility to ensure all school boards adopt HHB Policies that comply with the minimums set forth in the Model HHB Policy and the Model HHB Procedures. The Model HHB Policy adopts the statutory definition of "harassment" with a slight modification.[3]

---

[2] The Model HHB Policy does not solely prohibit harassment, hazing, or bullying of students on school property or at school functions, and thus it does not contain the language set forth in the VPA Policy that "Vermont's Public Accommodations Act (9 V.S.A. 4502) and VPA policies prohibit discrimination and/or harassment of students on school property or at school functions by students or employees." (Doc. 1-14 at 5.)

[3] The Model HHB Policy alters the statutory definition of "harassment" to eliminate the reference to statutory subsections present in § 11(a)(26)(B) and instead provides, "Harassment includes conduct as defined above and may also constitute one or more of the following[.]" (Doc. 1-11 at 5.) The Model HHB Policy also changes the order of subject matters listed. *See id.* at 5-6 (requiring speech or conduct to be "based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status[,] disability, sex, sexual orientation, or gender identity[]").

As a "supervisory union board of directors," the Board is a "school board[,]" *id.* § 11(a)(9), and promulgated its own hazing, harassment, and bullying policy (the "School's HHB Policy") and procedures (the "School's HHB Procedures") which adopted the substantive provisions of the Model HHB Policy and the Model HHB Procedures.[4]

As the "chief executive officer[,]" 16 V.S.A. § 11(a)(13), of the Windsor Central Supervisory Union, Superintendent Sousa manages school operations at Woodstock H.S. and is responsible for enforcing the Board's policies, including the School's HHB Policy. She has authority over the School District's employment decisions, including athletic coaching staff, and is accountable to the Board for school employees' performance. She has been Superintendent of Windsor Central Supervisory Union at all relevant times set forth in Plaintiff's Verified Complaint.

The Model HHB Policy requires a school district to be "committed to providing all of its students with a safe and supportive school environment in which all members of the school community are treated with respect." (Doc. 1-11 at 2.) It also states:

> The purpose of this policy is to (1) prohibit conduct or communication that is directed at a person's protected characteristics as defined below and that has the purpose or effect of substantially disrupting the educational learning process and/or access to educational resources or creates a hostile learning environment; (2) prohibit conduct intended to ridicule, humiliate or intimidate students in a manner as defined under this policy.

*Id.* at 3. The Model HHB Policy is intended to be applied "in a manner that is consistent with . . . the First Amendment[.]" (Doc. 1-11 at 3.)

The Model HHB Policy requires a school district to "take prompt and appropriate remedial action reasonably calculated to stop the hazing, harassment and/or bullying; prevent its recurrence; and to remedy the impact of the offending conduct on the victim(s), where appropriate" in response to "substantiated complaints" of harassment. (Doc. 1 at 19, ¶ 151) (internal quotation marks omitted). "[A]ppropriate remedial action"

---

[4] The School's HHB Policy's definition of "harassment" adds "a student or a student's family member's . . . gender expression[]" to the list of subject matter encompassed. (Doc. 1-13 at 3.)

includes "a wide range of responses from education to serious discipline," such as "termination for employees." *Id.* at ¶ 152 (internal quotation marks omitted). The Model HHB Policy incorporates by reference the Model HHB Procedures, which govern how a complaint of hazing, harassment, or bullying should be addressed.

Following a complaint of harassment, the Model HHB Procedures require an employee to promptly notify the school administration of the information in the complaint. If the school administrator determines the conduct alleged may constitute harassment, hazing, or bullying, "the school administrator shall, as soon as reasonably possible, provide a copy of the [School's HHB Policy and the School's HHB Procedures] to the complainant and accused individual[.]" (Doc. 1-13 at 7.)

### B. The VPA's Role.

The Verified Complaint asserts the VPA is a state actor that oversees interscholastic athletics in Vermont and controls the scheduling of, participation in, and policies governing VPA athletic competitions. The VPA Activity Standards Committee votes on all VPA policies, which are then subject to approval by the VPA Executive Council. One of the VPA Executive Council's objectives is to "[c]ollaborate with [the Agency of Education] to support [p]rincipals[.]" (Doc. 1-7 at 2.)

The VPA has 270 school members which must abide by the VPA's policies to retain membership and compete in VPA athletic competitions. The VPA may prohibit a member school that violates its policies from competing in VPA athletic competitions. All Vermont public high schools, including Woodstock H.S., are members of the VPA. Executive Director Nichols is the VPA's chief executive officer and has the powers, duties, and responsibilities associated with that office.

The VPA's athletic policy (the "VPA Policy") states, "Vermont's Public Accommodations Act (9 V.S.A. [§ ]5402) and VPA policies prohibit discrimination and/or harassment of students on school property or at school functions by students or employees." (Doc. 1-14 at 5.) The Verified Complaint alleges the VPA has adopted the statutory definition of "harassment" set forth in 16 V.S.A. § 11(a)(26). The VPA does not

deny this in its motion to dismiss, with the caveat that the VPA Policy applies only on school property or at a school function.

Vermont law requires the superintendent of a school district to consult with the VPA to ensure new principals "receive[] mentoring supports during at least the first two years of employment[]" that are "consistent with best practices, research-based approaches, or other successful models . . . identified jointly by the [VPA] and the Vermont Superintendents Association." 16 V.S.A. § 245(a).

Executive Director Nichols is a member of the Secretary of Education's Advisory Council, which "review[s] and coordinate[s] school and statewide activities relating to the prevention of and response to harassment, hazing, and bullying." 16 V.S.A. § 570(d)(2). The Vermont Agency of Education has published a document titled, "Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students[,]" which states that participation in athletics should be resolved on a case-by-case basis and instructs schools to refer to the VPA Policy. (Doc. 1 at 8.)

### C.   Plaintiff's Allegations Regarding his Termination.

The Verified Complaint, which Plaintiff signed under the penalty of perjury set forth in 28 U.S.C. § 1746, states Plaintiff is "a practicing Roman Catholic who believes that God creates males and females with immutable sex." (Doc. 1 at 2, ¶ 3.) Plaintiff "believes, based on scientific evidence, that there are only two sexes, which are male and female, and that sex is determined by a person's chromosomes." *Id.* He "understands, based on scientific evidence and his own experience as a coach, that children do not have a fully developed capacity to understand the long-term consequences of their decisions." *Id.* at 11, ¶ 71.

His "faith also instructs that all people are children of God with inherent dignity and should be treated with love and respect." *Id.* at 10, ¶ 67. He "therefore strives to treat all people with love and respect." *Id.* at ¶ 68.

Plaintiff founded the snowboarding team at Woodstock H.S. in 2011 and served as its head coach thereafter. Each year from 2011 to 2023, the School Board Defendants

8

renewed his coaching contract. In his capacity as head coach, Plaintiff was required "[t]o help each participating student[] achieve a level of skill, an appreciation for the values of discipline and sportsmanship, and an increased level of self-esteem." (Doc. 1-10 at 10.)

Pursuant to his contract for the 2022-2023 season, Plaintiff's responsibilities included helping student athletes develop the skills necessary for achievement in snowboarding; planning and scheduling practice; working with the athletic director to schedule interscholastic events; recommending purchase of appropriate equipment, supplies, and uniforms; maintaining necessary forms and records; and overseeing safety conditions of the "facility or area in which [snowboarding] is conducted" while students are present. *Id.* Plaintiff alleges he never received a complaint about his coaching, nor was he disciplined, until the events alleged in the Verified Complaint.

On February 8, 2023, Plaintiff and the Woodstock H.S. snowboarding team were waiting in a ski lodge for a snowboarding competition. The Verified Complaint asserts that no other teams or student athletes were present in the area where they were waiting. During this time period, coaches and student athletes completed work, communicated with family or friends, accessed their phones, or talked with each other.

On the day in question, Plaintiff's team was slated to compete against "a team from another school district that had a male snowboarder who identifies as a female and competes in the female division." (Doc. 1 at 13, ¶ 93.) Plaintiff overheard a conversation between two of his student athletes about transgender athletes in which a male student expressed his opinion that males competing in sports against females is unfair. In response, a female student "accus[ed] [the male student] of being transphobic." *Id.* at ¶ 98. Plaintiff asserts he joined the conversation and stated "that as a matter of biology, males and females have different DNA[,]" *id.* at 14, ¶ 101, and "those differences in DNA cause males to develop differently than females and to have different physical characteristics[,]" *id.* at ¶ 102. He "gave the example that an archaeologist digging up bones would categorize them as belonging either to a male or female because of the inherent differences between males and females." *Id.* He further "discussed that different

physical characteristics generally give males competitive advantages in athletic competitions." *Id.* at ¶ 103.

The Verified Complaint asserts the conversation between Plaintiff and the two students lasted less than three minutes. Plaintiff alleges that, during the conversation, he was not engaged in employee speech such as instructing players, discussing strategy, or encouraging on-field performance. Plaintiff avers he did not refer to the transgender athlete on the opposing team and there were no student athletes who identified as transgender on his team. Thereafter, the snowboarding team competed and shared a bus home with another team which included the transgender athlete. The bus trip home took place without incident.

The following day, Woodstock H.S. Athletic Director Jack Boymer ("A.D. Boymer") told Plaintiff that a complaint was filed about the February 8 discussion. Plaintiff asserts he informed A.D. Boymer that "he had discussed biological differences between males and females" with two student athletes. (Doc. 1 at 15, ¶ 116.) At approximately 3:00 p.m. that same day, Superintendent Sousa met with Plaintiff and handed him a notice of "immediate termination" (Doc. 1-10 at 3) (internal quotation marks omitted) for violating the School's HHB Policy and the VPA Policy. Superintendent Sousa did not inform Plaintiff of the School's HHB Procedures or his rights thereunder.

The notice of termination states that Woodstock H.S. received "a complaint that [Plaintiff] had used disparaging terms to identify and describe a student on an opposing team at a competition" and that Plaintiff "confirmed that [he] made reference to [a] student in a manner that questioned the legitimacy and appropriateness of the student competing on the girls' team to members of the [Woodstock H.S.] Snowboard Team[.]" *Id.* The notice further provides that "[f]ollowing district procedures, . . . administrators investigated, and the findings confirmed that [Plaintiff's] actions violated" the School's HHB Policy. *Id.* It states Superintendent Sousa "find[s] that [Plaintiff's] use of disparaging names created an objectively offensive environment and constituted harassment based on gender identity, justifying terminating [Plaintiff's] contract as a

10

snowboarding coach." *Id.* It notes that Plaintiff "will not be considered for any future coaching positions within the Windsor Central Unified Union School District." *Id.*

After handing Plaintiff the notice, Superintendent Sousa allegedly told him the investigation "was not complete[,]" (Doc. 1 at 16, ¶ 124) and "she did not have all the details of [his] speech on February 8[,]" *id.* at ¶ 125. Plaintiff asserts Superintendent Sousa informed him that he would receive the investigative report the following day but he never received it. The Verified Complaint alleges Plaintiff was not informed of his confidentiality or appeal rights and was not given the opportunity to present witnesses or evidence. He claims the Board ratified his termination. At the time, there were three weeks remaining in the snowboarding season.

Plaintiff alleges that, but for his termination, his contract would have been "automatically renewed for the 2023-[20]24 season[,]" *id.* at ¶ 135, as it had been for the previous ten seasons without the need for his reapplication or an interview. Plaintiff would like to coach for the 2023-2024 season, and any contract to do so must allegedly be signed no later than December 2023. If reinstated, he intends to "continue to express his beliefs regarding the immutability of sex." *Id.* at 21, ¶ 166.

Plaintiff alleges the Model HHB Policy, the School's HHB Policy, and the VPA Policy deprived him of his right to free speech and caused him a loss of income and a loss of reputation, as well as pain, suffering, and emotional distress. He contends there are other school employees who agree with his opinions on "the immutability of sex and the appropriateness of a teenage male competing against teenage females in an athletic competition[,]" *id.* at ¶ 168, but their speech has been "chill[ed,]" *id.* at 27, ¶ 223, because "they are too afraid to express [their opinions] for fear of suffering termination[,]" (Doc. 1 at 21, ¶ 169) and because they "fear that expressing views like [Plaintiff's] publicly will cause them to incur discipline from Defendants[,]" *id.* at ¶ 170.

### D.   Whether to Consider Evidence from the Preliminary Injunction Hearing to Address Standing.

Executive Director Nichols requests the court consider evidence presented at the preliminary injunction hearing to decide the issue of standing. No party has opposed this

request. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (ruling that where a Rule 12(b)(1) motion "place[s] jurisdictional facts in dispute[,]" a court may consider "evidence outside the pleadings" when deciding whether a party has standing).

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). "When a Rule 12(b)(1) motion is facial, . . . the plaintiff has no evidentiary burden" and "[t]he task of the district court is to determine whether the [p]leading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (internal quotation marks and citations omitted) (alterations adopted). "Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [p]leading[,]" at which point "the plaintiff[] will need to come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion[ ]reveal the existence of factual problems in the assertion of jurisdiction." *Id.* at 57 (internal quotation marks and citations omitted). "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Id.*

Because the parties consent to the court considering the motion for a preliminary injunction and motions to dismiss together, the court will evaluate the motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) as a fact-based motion and consider the evidence submitted at the preliminary injunction hearing to determine the issue of standing.

**E.    Findings of Fact from the Preliminary Injunction Hearing.**

Based upon the preponderance of the evidence, the court makes the following findings of fact:

1.  In 2011, Plaintiff David J. Bloch founded the snowboarding program at Woodstock H.S., which includes a middle school. He served as head coach for the Woodstock H.S.'s snowboarding teams from 2011 until his termination in February 2023.

2. The Woodstock H.S. team includes middle schoolers who are between twelve and thirteen years old, although they are not on the travel team. The remaining team members are between fourteen and eighteen years of age. In 2022-2023, there were between twenty and twenty-five team members with between six and eight travel team members on each team.

3. Plaintiff's status as head coach started on a volunteer basis and was later subject to a written contract that was renewed each year. Woodstock H.S. was his employer. Plaintiff's contract with the School District for the 2022-2023 academic year stated:

> The sum of money to be paid is and shall be governed by contract between the Windsor Central Education Association and the Board of School Directors for Windsor Central Unified Union School District.
>
> Job Goal: To help each participating student[] achieve a level of skill, an appreciation for the values of discipline and sportsmanship, and an increased level of self-esteem.
>
> Performance Responsibilities:
>
> 1.) Coaches individual participants in the skills necessary for excellent achievement in the sport involved.
>
> 2.) Plans and schedules a regular program of practice sessions.
>
> 3.) Works closely with the athletic director in scheduling interscholastic contests.
>
> 4.) Recommends purchase of equipment, supplies and uniforms, as appropriate.
>
> 5.) Maintains necessary attendance forms, insurance records and similar paperwork.
>
> 6.) Oversees the safety conditions of the facility or area in which assigned sport is conducted at all times that the students are present.
>
> Failure on my part to fulfill any part of this contract will make this contract null and void.

(Exhibit D) (the "Contract"). The Contract governed Plaintiff's employment. He concedes he was an "at will" employee and could quit at any time.

4. Prior to each athletic season, Woodstock H.S. reviews the contracts of its coaches and recommends whether a coach should be hired for the upcoming season. There is no right to automatic renewal.

5. Plaintiff credibly testified that his coaching responsibilities included "setting a good example" and acting consistent with the School's educational philosophies. He agrees that it is important to be respectful of students and that if he mocked, denigrated, or made fun of a student, he would expect to be terminated.

6. As part of his coaching responsibilities, Plaintiff reviewed the School's HHB Policy, which states in relevant part:

> "Harassment" means an incident or incidents of verbal, written, visual, or physical conduct, including any incident conducted by electronic means, based on or motivated by a student's or a student's family member's actual or perceived race, religion, creed, color, national origin, marital status, disability, sex, sexual orientation, gender identity, or gender expression, that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating[,] hostile, or offensive environment.

(Doc. 1-13 at 3-4.)

> If in the judgment of the school administrator, the [notice of information that harassment, hazing, and/or bulling may have occurred] alleges conduct which may constitute harassment, hazing or bullying, the school administrator shall, as soon as reasonably possible, provide a copy of the [School's HHB Policy] and [the School's HHB Procedures] to the complainant and accused individual[.]

*Id.* at 7.

> In determining whether the conduct constitutes a violation of this policy, the investigator shall consider the surrounding circumstances, the nature of the behavior, past incidents or past or continuing patterns of behavior, the relationships between the parties involved and the context in which the alleged incidents occurred. The complainant and accused will be provided the opportunity to present witnesses and other evidence during an investigation. The school will also consider the impact of relevant off-[]campus conduct on the school environment where direct harm to the welfare of the school

14

> can be demonstrated or the conduct can be shown to pose a clear and substantial interference with another student's equal access to educational programs.

*Id.* at 8.

> The investigator shall prepare a written report to include a statement of the findings of the investigator as to whether the allegations have been substantiated, and as to whether the alleged conduct constitutes hazing, harassment and/or bullying.

*Id.*

> After a final determination that an act(s) of hazing, harassment and/or bullying has been committed, the school shall take prompt and appropriate disciplinary and/or remedial action reasonably calculated to stop the hazing, harassment and/or bullying and prevent any recurrence of harassment, hazing and/or bullying, and remedy its effects on the victim(s).

*Id.* at 9.

> Remedial action may include but not be limited to an age appropriate warning, reprimand, education, training and counseling, transfer, suspension, and/or expulsion of a student, and warning, reprimand, education, training and counseling, transfer, suspension and/or termination of an employee.

*Id.*

> Any person determined to have engaged in an act(s) of hazing, harassment and/or bullying may appeal the determination and/or any related disciplinary action(s) taken, directly to the school board of the school district.

(Doc. 1-13 at 11-12.)

> The school district shall make available upon request of the Accused Student/Appellant, any relevant information, documents, materials, etc. related to the investigation and related finding[s] on appeal that can be redacted and de-identified in compliance with the requirements set forth at 34 CFR Part 99.

*Id.* at 12.

7. Plaintiff testified that he believes a person's sex is immutable and unchanging and that a transgender person may assert a different gender, but this does not change that person's sex. He asserts this opinion is motivated by his religious beliefs.

8. On February 8, 2023, Plaintiff and the Woodstock H.S. snowboarding team (approximately twelve students) were in the lodge at the Jay Peak ski resort during a break in a snowboarding competition. During this time period, students as well as coaches were free to use their phones, converse, eat lunch, use the facilities, attend to their equipment, and engage in other activities. If a team member wanted to leave the lodge for any length of time, the team member would be expected to obtain Plaintiff's permission. The lodge was open to the general public.

9. At the February 8 competition, Plaintiff was the only coach present for the Woodstock H.S. team. Other coaches may have been present in the lodge with their own teams. Plaintiff was not "off the clock" at the time the relevant events took place.

10. During a break in the competition, Plaintiff encountered two Woodstock H.S. team members engaged in a discussion at one of the tables. He heard the words "DNA" and "transphobe." J.W., one of the students participating in the discussion, expressed his opinion that it was unfair for an athlete with a male anatomy and biology to compete against a female. The student to whom he expressed this opinion is transgender[5] and called him a "transphobe," which offended him. According to J.W, the conversation got "heated."

11. Plaintiff joined the discussion and told J.W. that he was correct that there are biological differences between males and females. The participants to the conversation understood the discussion arose from a member of the opposing team who was transgender and who was competing in snowboarding events against female student-athletes. Plaintiff voiced his opinion that although people could express their gender differently, because individuals born male and female have differences in their DNA, muscle mass, and physical characteristics, males have a competitive advantage over females in sports. He noted that when archeologists

---

[5] The Verified Complaint alleges there were no transgender students on Woodstock H.S.'s snowboarding team. *See* Doc. 1 at 14, ¶ 113 ("[Plaintiff] does not have any snowboarders who identify as transgender on his team.").

dug up human remains, they labeled those remains as either "male" or "female." He observed that he knew men who were feminine and women who were masculine. The other student in the conversation expressed a belief that testing made it possible to ensure competition was fair.

12. J.W. described the conversation as brief and respectful. The other team member who participated in the conversation did not testify. J.W. acknowledges that the other team member seemed offended by the conversation. He nonetheless claims this student later told him that the conversation was neither derogatory nor offensive.[6] Because this hearsay is uncorroborated and inconsistent with J.W.'s testimony that the other student seemed "offended," the court does not credit it.

13. J.W. described Plaintiff as an excellent coach who was a positive influence on the team. Although he has heard complaints about Plaintiff, he has never heard anyone say they do not "like" Plaintiff.

14. As the competition was set to resume, Plaintiff attempted to rally the Woodstock H.S. team. He claims he said: "Let's go out and beat this biological boy." He asserts he made the comment under his breath and was not sure anyone heard it. He contends he made the comment out of frustration on behalf of his female team members. He did not include this comment in his Verified Complaint and did not provide a reason for omitting it.[7] He does not think his comment was inappropriate.

15. The Woodstock H.S. team rode home from the snowboarding competition with the transgender student, W., who competed in the female snowboarding event. Plaintiff sat with W.'s father. He does not recall a further discussion about gender.

---

[6] Plaintiff makes a similar statement in his Verified Complaint. *See* Doc. 1 at 14, ¶ 108 ("Despite disagreeing with [Plaintiff's] views on the appropriateness of males who identify as females competing against females, Student 2 thanked him for a 'good conversation.'")

[7] In his Verified Complaint, Plaintiff avers, "At no point in the conversation did [Plaintiff] refer to the transgender-identifying snowboarder." (Doc. 1 at 14, ¶ 104.)

16. During the evening of February 8, 2023, A.D. Boymer received a text from Woodstock H.S's Assistant Principal, Cody TanCreti, ("Assistant Principal TanCreti") who reported what he had heard from the Athletic Director of another school:

> FYI-the Woodstock Coach made an inappropriate comment about [W]. [W.] has made friends with [] a few of the Woodstock teammates and the coach was telling his kids that they need to try real hard because they are competing against a guy pretending to be a girl.

> Apparently he planned on speaking with our coach but found out [W.] was his child so did not approach him.

(Exhibit H) (the "Text"). Assistant Principal TanCreti called the Athletic Director, who forwarded the information in the Text. The Athletic Director stated that the report came from a parent and that he was forwarding all of the information that he had. Assistant Principal TanCreti advised Superintendent Sousa of the Text that evening.

17. Assistant Principal TanCreti met with A.D. Boymer and told him he needed to call Plaintiff, advise him of the information contained in the Text, and provide him with an opportunity to present his side of what had transpired.

18. On the morning of February 9, 2023, A.D. Boymer called Plaintiff at home to inform him he had received a complaint that Plaintiff had used disparaging terms to identify and describe a student on the opposing team at the February 8 competition. According to A.D. Boymer, Plaintiff said he was expecting the phone call and became very "emotional." Plaintiff admitted that he had questioned the legitimacy and appropriateness of the transgender student competing on the female team but did not feel he had done anything wrong. Plaintiff identified each of the comments he made at the February 8 competition.

19. A.D. Boymer told Plaintiff an investigation was under way and Plaintiff would be expected to meet with Superintendent Sousa. He did not notify Plaintiff of his right to a hearing or to call witnesses. A.D. Boymer summarized his conversation with Plaintiff as follows:

I, Jack Boymer, called Dave Bloch to inform him of the news we had received from Hartford AD, Jeff Moreno. I told him that it was reported that he had made inappropriate comments about a student-athlete from Hartford, who was competing in the snowboarding competition the day before. And that he had been heard saying to a group of Woodstock student-athletes that "they need to try real hard because they are competing against a guy pretending to be a girl."

Here are the notes from his reply:

- Did not deny what was alleged
- Girls are having to compete against biological males
- These rules are pitting us against each other
- Don't think it's fair
- Had a conversation about Trans with a group of athletes
- It was a bigger conversation than just what was alleged
- Has a lawyer ready to go and fight this
- Willing to be a headline and be on every newspaper
- Has already received emails from parents

(Exhibit E.)

20. Assistant Principal TanCreti used the roster for the Woodstock H.S. snowboarding team and started calling team members to investigate the complaint. When A.D. Boymer reported that Plaintiff had confirmed he had made the comments attributed to him, Assistant Principal TanCreti stopped calling students. Assistant Principal TanCreti did not speak directly to Plaintiff. He is unaware of any other complaints in Plaintiff's file.

21. In the course of the investigation, A.D. Boymer generated the following notes which were not provided to Plaintiff.

On Thursday, February 9, Athletic Director Boymer informed you the school was in receipt of a complaint that you had used disparaging terms to identify and describe a student on an opposing team at a competition on Wednesday, February 8. When asked about the complaint, you confirmed that you had referred to the student in a manner that questioned the legitimacy and appropriateness of the

student competing on the girls' team with members of the WUHS Snowboard Team and, thus, the substance of the complaint.

In response to the incident, three separate students and one assistant coach were interviewed. Below are the results of those interviews.

Interview 1

SC

8:44 am 2/9

This student was not at the event but immediately knew why I had asked them to come to my office. She [began] the conversation by saying[, "][Is] this about the transphobic behavior from our coach?["] She then added, "He is transphobic[.]" She explained that she was not at the event but heard from her friends that the coach had told the team they had to be ready because they were going up against a male athlete. She then went on to explain that when she is present he is often sexist, talks about politics, and has told people he is "uncanc[el]able[.]" The student reported that she had complained about this coach in the past.

Interview 2

SG

8:55

SG explained that the coach refused to use the correct pronouns for the student on an opposing team. [SG] said the coach gathered the team to tell them that they were going against a boy pretending to be a girl. SG said that they argued back in an effort to support the athlete and got into a debate with the coach. SG was friends with the athlete on the other team and informed them that this had happened.

Interview 3

AW

9:00- 2/9/23

AW began by saying that they were eating lunch, and the coach yelled across the table, "[]Get out there[;] you have some male competition!" The girls responded by saying, "[W]hat?" The coach said[,] "[C]ome over here[;] I probably shouldn't yell this across the room." The coach then repeated the statement, "You have some male competition today." AW reported sexist behavior from the coach, explaining that they only have two male captains. AW said that one day a video was played showing how to perform specific tricks. The tricks were performed by male athletes. The girls spoke

up and asked to have some female athletes shown. The coach complied, showed the video and then asked the entire group i[f] anyone was still awake at the completion of the video.

Adult

11:00-2/9/23

I asked S, who was not at the event, if she had seen this type of behavior. S responded with[,] "[]I am not surprised." While S had not heard comments specific to this incident, she had witnessed sexist behavior from the coach favoring male athletes while neglecting the female athletes on the team.

(Exhibit F.)

22. J.W. was not interviewed in the course of the investigation, although he spoke to A.D. Boymer and others and voiced his concerns about the treatment of Plaintiff. He did not hear the comment "let's beat this biological boy" and does not believe Plaintiff said it, although he concedes it would not be a "good comment" to make if he did.

23. On February 9, 2023, Superintendent Sousa asked Plaintiff to meet her in her office. She told Plaintiff that "several parents" and "several students" had reported that Plaintiff had violated the School's HHB Policy. She provided Plaintiff with a termination letter that had been drafted by a lawyer. She did not inform Plaintiff of his right to a hearing or an appeal.

24. According to Superintendent Sousa, Plaintiff said he knew the meeting was because of what he had said at the competition and admitted he said there was a "guy pretending to be a girl." He said he was going to hire a lawyer and was "going to call the newspapers" and she should give him "a pass." He stated his belief that the School's HHB Policy did not apply to other schools' students.

25. Superintendent Sousa terminated Plaintiff because he denigrated a student. With or without the School's HHB Policy, she contends the outcome would have been the same. She agrees she could have issued a warning, a reprimand, mandated training, or issued a suspension or any combination of these measures but instead

chose termination. She has a transgender child, who was previously on the snowboarding team, and felt the issue was an important one.

26. Superintendent Sousa's termination letter states as follows:

> This correspondence shall serve as formal notice of the immediate termination of your employment as a WUHSMS Snowboard Coach due to your violation of the WCSU Prevention of Hazing, Harassment, and Bully[ing] Policy and the Vermont Principals' Association Athletics Policy.
>
> On Thursday, February 9, Athletic Director Boymer informed you the school was in receipt of a complaint that you had used disparaging terms to identify and describe a student on an opposing team at a competition on Wednesday, February 8. When asked about the complaint, you confirmed that you made reference to the student in a manner that questioned the legitimacy and appropriateness of the student competing on the girls' team to members of the WUHS Snowboard Team and, thus, the substance of the complaint. Following district procedures, WUHSMS administrators investigated, and the findings confirmed that your actions violated the policy.
>
> The WCSU policy on the Prevention of Harassment, Hazing and Bullying Policy- Policy C10 defines harassment as: ["']Harassment['] means an incident or incidents of verbal, written, visual, or physical conduct, including any incident conducted by electronic means, based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status, disability, sex, sexual orientation, or gender identity, that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating[,] hostile, or offensive environment."
>
> I find that your use of disparaging names created an objectively offensive environment and constituted harassment based on gender identity, justifying terminating your contract as a snowboarding coach. In addition, you will not be considered for any future coaching positions within the Windsor Central Unified Union School District.

(Exhibit G.)

27. Plaintiff denies that he intended to leave his coaching position, although he had expressed a desire to retire. He would like to coach during the 2023-2024 season.

28. Jay Nichols is the executive director of the VPA. Prior to the court's hearing, Plaintiff had never met Executive Director Nichols and had no contact with him. Neither Executive Director Nichols nor the VPA played any role in Plaintiff's termination. Secretary Bouchey had no role in Plaintiff's termination as well.

### F. Whether Plaintiff Has Standing to Sue Executive Director Nichols and Secretary Bouchey for Wrongful Termination, Retaliation, and Violation of his Procedural Due Process Rights.

Executive Director Nichols and Secretary Bouchey seek dismissal of Plaintiff's claims against them for lack of subject matter jurisdiction,[8] arguing that Plaintiff lacks standing, which "is a federal jurisdictional question 'determining the power of the court to entertain the suit.'" *Carver v. City of N.Y.*, 621 F.3d 221, 225 (2d Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). They point out they had no personal or institutional involvement in Plaintiff's termination or the decision to ban him from future positions. They also lack the power to reinstate him.

To establish the "irreducible constitutional minimum of standing[,]" a plaintiff must demonstrate three elements: (1) that he or she has "suffered an injury in fact[,]" (2) which is "fairly traceable to the challenged action of the defendant," and (3) which is "likely . . . [to] be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks, alterations, and footnote omitted).

"[T]he 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party[.]" *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976). "[I]ndirectness of injury, while not necessarily fatal to standing, may make it substantially more difficult to meet

---

[8] Art. III of the United States Constitution limits the jurisdiction of federal courts to "Cases" or "Controversies[.]" U.S. Const. art. III, § 2, cl. 1. "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 38 (2d Cir. 2015) (internal quotation marks omitted).

the minimum requirement of Art. III: To establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id.* at 44-45 (internal quotation marks omitted). This is because the Supreme Court has "refus[ed] to endorse standing theories that rest on speculation about the decisions of independent actors[.]" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (internal quotation marks omitted).

"[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (alteration adopted) (internal quotation marks omitted).

Plaintiff concedes that neither Executive Director Nichols nor the VPA played any role in his termination. There is also no evidence that Executive Director Nichols or the VPA have the power to reinstate Plaintiff to his coaching position. Instead, both Plaintiff's termination and the right to reinstate him lie with other independent parties.

Because the decision to terminate Plaintiff's employment and his request for reinstatement are not fairly traceable to Executive Director Nichols, nor does Executive Director Nichols have the power to redress those claims, Plaintiff lacks standing to assert a retaliation and procedural due process claim against him. *See Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 322 (S.D.N.Y. 2020) (concluding plaintiff lacked standing where defendant was "many steps removed from each of the challenged actions[]") (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). As a result, Plaintiff's retaliation and procedural due process claims against Executive Director Nichols must be DISMISSED.

Similarly, Secretary Bouchey had no personal involvement in Plaintiff's termination and does not have the authority to reinstate him. His claims for retaliation and procedural due process violations are thus not fairly traceable to her as well. *Carver*,

621 F.3d at 226. To the extent Plaintiff asserts these claims against Secretary Bouchey, those claims are DISMISSED.

> **G.    Whether Plaintiff Has Standing to Assert First Amendment Challenges Against the Executive Director Nichols and Superintendent Bouchey.**

Whether Plaintiff has standing to assert a First Amendment challenge to the VPA Policy and the Model HHB Policy is a closer question and one that cannot be determined at the pleading stage even with the additional facts provided at the court's evidentiary hearing.

Executive Director Nichols argues that Plaintiff's injuries are not fairly traceable to the VPA Policy because Plaintiff's notice of termination merely cites to the existence of the VPA Policy but does not rely on it for grounds for his termination. This is not wholly accurate because Superintendent Sousa's letter states Plaintiff's termination was "due to [his] violation of the WCSU Prevention of Hazing, Harassment, and Bully[ing] Policy and the Vermont Principals' Association Athletics Policy." (Exhibit G.) Plaintiff contends his First Amendment injuries are fairly traceable to the VPA Policy because the VPA requires member schools to abide by its policies in order to compete in VPA athletic events. He contends the VPA Policy was a "'moving force' behind Defendants' constitutional violations." (Doc. 56 at 11) (citing *Cash v. Cnty. of Erie*, 654 F.3d 324, 342 (2d Cir. 2011) (noting that claims under 42 U.S.C. § 1983 must allege a defendant was a "moving force" in causing the plaintiff's harm for purposes of causation)). "A plaintiff does not lack standing merely because [his] injury is an indirect product of the defendant's conduct." *Garelick v. Sullivan*, 987 F.2d 913, 919 (2d Cir. 1993).

Plaintiff argues that if the court declared the VPA Policy unconstitutional, his injuries and the impediment to his future employment at Woodstock H.S. would be partially redressed because his future speech would not be "chilled."

Secretary Bouchey contends that Plaintiff has failed to allege that the Model HHB Policy caused his termination because the conduct alleged in his Verified Complaint does not violate the Model HHB Policy. She asserts that if, as Plaintiff alleges, he spoke

privately in a nondisruptive manner, his speech did not have the "purpose or effect" of objectively interfering with a student's educational performance or access to school resources or creating an objectively offensive environment. She does not address, however, whether Plaintiff's additional statement, omitted from his Verified Complaint, to the effect of "Let's go out and beat this biological boy" or "they need to try real hard because they are competing against a guy pretending to be a girl" would violate the Model HHB Policy. As it was the latter statement that purportedly gave rise to Plaintiff's termination, Secretary Bouchey's argument that the Model HHB Policy was not violated is misplaced.

Plaintiff asserts his injuries are fairly traceable to the Model HHB Policy for the further reason that, under Vermont law, school boards are required to adopt policies at least as restrictive as the Model HHB Policy, the School's HHB Policy substantively adopted the Model HHB Policy, and Superintendent Sousa cited the School's HHB Policy in his notice of termination. There is thus at least some causal relationship between the Model HHB Policy and his termination even if Superintendent Sousa credibly testified that Plaintiff would have been terminated with or without a policy.

If Plaintiff is reinstated, he will be subject to the definition of "harassment" akin to that set forth in the Model HHB Policy. Since Plaintiff plans to continue to voice his opinions on gender differences if reinstated, he argues he would likely incur future discipline unless the Model HHB Policy is declared unconstitutional.

With respect to establishing standing to sue a defendant for the acts of another, "causation turns on the degree to which the defendant's actions constrained or influenced the decision of the final actor in the chain of causation." *Carver*, 621 F.3d at 226. A plaintiff bringing a pre-enforcement facial challenge to a law must demonstrate "an actual and well-founded fear that the law will be enforced against" him or her in order to establish standing. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). In such cases, "the alleged danger . . . is, in large measure, one of self-censorship; a harm that can be realized even without" actual enforcement. *Id.*

A plaintiff satisfies the injury-in-fact requirement in a pre-enforcement case where

he or she "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute [or government policy], and there exists a credible threat of [enforcement] thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal quotation marks omitted).

Although a close question, Plaintiff has plausibly alleged the VPA Policy and the Model HHB Policy contributed to his termination and that if he is reinstated he faces a credible future threat of enforcement thereunder. *See Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) (ruling that standing "requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant[]'") (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)) (alteration in original).

In addition to his own rights, Plaintiff seeks to vindicate the First Amendment rights of others who may violate the VPA Policy or the Model HHB Policy by virtue of their expressed beliefs on gender roles in competitive sports. In his Verified Complaint, he alleges there are other school employees subject to these policies that share his beliefs and opinions but refrain from asserting them for fear of retribution.

Within the "prudential consideration[s]" for standing, there is "a species of third party (*jus tertii*) standing by which a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the [policies] in question." *Lerman v. Bd. of Elections*, 232 F.3d 135, 143-44 (2d Cir. 2000) (internal quotation marks omitted) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55-56 n.22 (1999) (plurality opinion)). Prudential limitations on standing are relaxed "when the claims are based on the assertion of a First Amendment right[,]" and "[i]n such cases, the plaintiff is allowed to challenge a law that may be legitimately applied to his or her own expressive conduct if the law has the potential to infringe unconstitutionally on the expressive conduct of others." *Dickerson v. Napolitano*, 604 F.3d 732, 742 (2d Cir. 2010).

Overbreadth and facial vagueness claims that implicate free speech rights may also be brought in some circumstances not only on a plaintiff's behalf, but on behalf of

third parties. *See id.* at 749 ("Overbreadth, like facial vagueness, is an exception to the prudential rule forbidding parties from asserting the rights of third parties.").

At the pleading stage, Plaintiff has sufficiently pled standing to challenge the VPA Policy and the Model HHB Policy to survive a motion to dismiss. *See Lujan*, 504 U.S. at 561 (stating "the manner and degree of evidence required" to satisfy plaintiff's burden of proof for standing increases throughout "successive stages of the litigation[]"). The court thus DENIES the Executive Director Nichols's and Secretary Bouchey's motions to dismiss Plaintiff's First Amendment challenges to their respective polices for lack of standing other than his retaliation and procedural due process claims against them which have been dismissed.

## III. Whether Plaintiff is Entitled to a Preliminary Injunction.

### A. Standard of Review.

A party seeking a preliminary injunction must "generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *A.C.L.U. v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations and internal quotation marks omitted).

As a threshold issue, the court considers whether the injunctive relief sought is "mandatory" or "prohibitory." The Second Circuit has explained:

> [W]e have required the movant to meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.
>
> . . .
>
> The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. A mandatory injunction, in contrast, is said to alter the status quo by commanding some

28

positive act. . . . [T]his distinction is important because we have held that a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief. The clear or substantial showing requirement—the variation in language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success.

. . .

A heightened standard has also been applied where an injunction—whether or not mandatory—will provide the movant with substantially all the relief that is sought. . . . If the use of a heightened standard is to be justified, the term "all the relief to which a plaintiff may be entitled" must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone. A heightened standard can thus be justified when the issuance of an injunction will render a trial on the merits largely or partly meaningless[.]

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-35 (2d Cir. 1995) (internal quotation marks and citations omitted).

The parties disagree regarding whether the injunction sought by Plaintiff is mandatory or prohibitory. Defendants contend it is mandatory because it would alter the status quo by granting Plaintiff employment to which he is not entitled as a matter of right. Plaintiff asserts that the injunction would be prohibitory because it would restore him to the "last actual, peaceable uncontested status which preceded the pending controversy[,]" *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014), and because it would "prohibit[], rather than compel[], government action by enjoining the future enforcement of [the challenged policies][,]" *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006).

In *Schrier v. University of Colorado*, 427 F.3d 1253 (10th Cir. 2005), the Tenth Circuit concluded that a preliminary injunction seeking reinstatement of a university faculty member to the position of department chair was a mandatory injunction because the requested relief "affirmatively require[d] the University to act in a particular way," and because reinstatement "would place the court in [a] position where it may have to provide supervision" to assure the university abided by the injunction. *Id.* at 1261

29

(alteration adopted).

Plaintiff's contract for employment as the coach for Woodstock H.S.'s snowboarding team expired at the end of the 2022-2023 season. Plaintiff proffered no credible evidence that he is entitled to an automatic renewal. The School Board Defendants proffered credible evidence to the contrary. Plaintiff seeks to be affirmatively re-hired and provided a new contract for the 2023-2024 season. He therefore requests a mandatory injunction and is thus subject to a higher burden of proof. *See Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (describing injunction that would "dictat[e] which candidate [the Air Force] must hire[]" as "mandatory").[9]

> **B.    Whether Plaintiff has Established Irreparable Harm.**

Plaintiff argues his loss of First Amendment freedoms and the challenged policies' restrictions on the speech of public employees constitute irreparable harm. Defendants counter that the chilling of speech alone is insufficient to demonstrate irreparable harm where a government employee engages in disparaging speech in the course of his employment and is terminated from his employment because of it.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction[.]" *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983) (internal quotation marks omitted). Irreparable harm means "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (internal quotation marks omitted). There is a "general proposition that irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty Assocs., Inc.*, 60 F.3d at 38. Courts must "determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's

---

[9] Plaintiff's request that Defendants "purge" all records regarding his termination is likewise mandatory because it would require them to destroy all records in their possession, custody, or control, an act they otherwise would not undertake.

rights." *Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997).

Plaintiff's request for reinstatement and automatic renewal of his employment contract are based upon harms that can be remedied by an award of monetary damages. They thus do not constitute irreparable harm.[10] Unless and until he is re-hired by the School Board Defendants, he identifies no likelihood that he would be subject to the VPA Policy, the School's HHB Policy, or the Model HHB Policy. He thus currently retains his full First Amendment rights. His irreparable harm is based solely on an alleged past deprivation of his First Amendment rights.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). However, "[e]ven when a complaint alleges First Amendment injuries, . . . irreparable harm is not presumed and must still be shown." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).

The thrust of Plaintiff's Verified Complaint is his termination for what he claims is constitutionally protected speech. He does not plausibly allege an "actual and imminent[,]" *New York ex rel. Schneiderman*, 787 F.3d at 660, harm he will suffer in the future because he has not shown he is entitled to have his employment contract renewed. Accordingly, his alleged harm is not prospective in nature. *See Kane v. De Blasio*, 19 F.4th 152, 172 n.20 (2d Cir. 2021) ("Preliminary injunctions are appropriate only to prevent *prospective* harm until the trial court can decide the case on the merits.") (emphasis in original); *see also Pirtek USA, LLC v. Zaetz*, 408 F. Supp. 2d 81, 84 (D. Conn. 2005) (explaining that because "a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits" to establish irreparable harm, a past injury alone "is insufficient to

---

[10] Secretary Bouchey asserts that Plaintiff's five-month delay in seeking preliminary injunctive relief undercuts his argument that irreparable harm exists. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (discussing "delay in seeking injunctive relief" as a factor to consider in evaluating irreparable harm).

establish irreparable harm[]") (internal quotation marks omitted) (citing *Deshawn v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). On this ground alone, Plaintiff has not demonstrated his entitlement to a preliminary injunction and his motion seeking one is DENIED. The court nonetheless proceeds to analyze the remaining requirements he must satisfy to obtain this extraordinary form of relief.

     **C.**    **Whether Plaintiff Can Establish a Likelihood of Success on the Merits.**

     The School Board Defendants have credibly established that, with or without an HHB policy, Plaintiff would have been terminated for allegedly disparaging or mocking a transgender student. Plaintiff, himself, testified that if he were found to have disparaged or mocked a student, he would expect to be terminated.

     The School Board Defendants have further established that Plaintiff's comments regarding "beating a male pretending to be a female" or "beating a biological boy" were made in public, were heard by students, and were thus not made in a private discussion with two students regarding the differences between male and female athletes.

     Plaintiff, in turn, has established that his notice of termination states he was terminated for a violation of the VPA Policy and the School's HHB Policy and he was deprived of the procedural protections to which he was arguably entitled. Indeed, he has established that the School Board Defendants ignored several of the procedures the School's HHB Policy requires. Plaintiff may therefore be able to establish a violation of his procedural due process rights, although he must first establish his entitlement to continued employment. As an at-will employee, this may prove a difficult hurdle to surmount. *See Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 127 (E.D.N.Y. 2013) (explaining that "procedural due process requirements 'apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and *property*'" and that "[a] plaintiff must first establish that he possesses a property right in his continued employment") (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972)) (emphasis in original). Plaintiff's likelihood of success on the merits with regard to his First Amendment challenges requires a multi-faceted analysis.

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech[.]" U.S. Const. amend. I. Its "protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). "In addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." *Id.*

"Pupils are on school premises in response to the statutory requirement that they attend school for the purpose of formal education." *Katz v. McAulay*, 438 F.2d 1058, 1061 (2d Cir. 1971). "The ultimate goal of school officials is to [e]nsure that the discipline necessary to the proper functioning of the school is maintained among both teachers and students." *James v. Bd. of Educ.*, 461 F.2d 566, 571 (2d Cir. 1972).

Schools have a "social interest in order and morality[,]" *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986), and "fulfilling their role as 'a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988) (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493, (1954)). These goals apply to school athletics programs, and coaches are "responsible for providing an educational environment conducive to learning team unity and sportsmanship and free from disruptions and distractions that could hurt or stray the cohesiveness of the team." *Lowery v. Euverard*, 497 F.3d 584, 594 (6th Cir. 2007) (internal quotation marks and citation omitted). As part of this mission, "preventing discrimination [in school] . . . is not only a legitimate, but a compelling, government interest." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001).

In addition, schools have an interest in constraining employees, "who [are] paid a salary so that [they] will contribute to the [school's] effective operation[,]" from "do[ing] or say[ing] things that detract from the [school's] effective operation[.]" *Piscottano v. Murphy*, 511 F.3d 247, 269 (2d Cir. 2007) (quoting *Waters v. Churchill*, 511 U.S. 661,

675 (1994) (plurality opinion)). This interest includes not "allow[ing] events to unfold to the extent that the disruption of the [school] . . . is manifest[.]" *Connick v. Myers*, 461 U.S. 138, 152 (1983).[11] Against this backdrop,

> a plaintiff claiming that he was retaliated against in violation of the First Amendment must plausibly allege that (1) he engaged in speech or activity that was protected by the First Amendment; (2) he suffered an adverse employment action; and (3) a causal connection existed between the adverse action and the protected activity.

*Specht v. City of New York*, 15 F.4th 594, 599-600 (2d Cir. 2021).

The School Board Defendants agree that Plaintiff has established the second and third elements of his retaliation claim because his employment was terminated because of his speech. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) (explaining that discharge is an adverse employment action). The sole issue is whether, in terminating Plaintiff's employment, the School Board Defendants violated the First Amendment, which "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

"To account for the complexity associated with the interplay between free speech rights and government employment," the court must "proceed[] in two steps." *Kennedy*, 142 S. Ct. at 2423 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) and *Garcetti*, 547 U.S. 410). At the first step, the court must determine whether "the speech or conduct at issue was protected[.]" *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82 (2d Cir. 2022). "This step one inquiry in turn encompasses two separate subquestions: (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (internal quotation marks and citation

---

[11] *See also Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998) (observing that "the government can prevail if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities, and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech[]") (citations omitted).

omitted). "If either question is answered in the negative, [the] inquiry may end there[,]" however, "[i]f both questions are answered in the affirmative, [the court] may proceed to consider whether the employer 'had an adequate justification for treating the employee differently from any other member of the general public based on the government's needs as an employer.'" *Shara*, 46 F.4th at 83 (quoting *Matthews*, 779 F.3d at 172).

Plaintiff argues that he spoke on a matter of public concern because the immutability of sex and the appropriateness of biological male athletes competing against biological female athletes is a matter of "contentious political . . . debate." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (internal quotation marks and citation omitted) (alteration in original). Defendants, however, produced evidence that Plaintiff directed at least one comment to a specific transgender student in order to arguably denigrate that student's gender identity. They produced evidence that some students and some parents took offense to Plaintiff's comment and that Plaintiff's behavior was part of a larger pattern of inappropriate comments.[12]

"The First Amendment does not require a [g]overnment employer to sit idly by while its employees insult those they are hired to serve and protect." *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006); *see also Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1188 (6th Cir. 1995) (concluding coach who used the N-word to motivate players to perform did not speak on matter of public concern). As a result, the precise nature of Plaintiff's comment and the circumstances in which it was made must be determined.

At this juncture, it is not clear whether Plaintiff urged his female athletes to "beat this boy pretending to be a girl" or whether he told them to "beat this biological boy," or whether the difference in terminology is material. It is also disputed whether Plaintiff was terminated solely for this comment or whether, as he contends in his Verified Complaint, his participation in a private student discussion regarding gender differences in athletic competition was the sole basis for his termination. It is also undetermined whether

---

[12] In his briefing, Plaintiff characterizes the violation that gave rise to his termination as a "single, off-duty comment." (Doc. 56 at 15.)

Plaintiff's alleged history of making offensive comments contributed to his ouster. For these reasons, a "[c]areful balancing of the need for the [policies] against the [policies'] constriction of [F]irst [A]mendment rights is called for. Full development of the facts is essential for the court to strike this balance." *Council of Greenburgh Civic Ass'ns v. U.S. Postal Serv.*, 586 F.2d 935, 936-37 (2d Cir. 1978). "For that reason, the norm is to wait until the summary judgment stage of the litigation to address the ultimate question of whether the [policies] should stand." *See Cornelio v. Connecticut*, 32 F.4th 160, 172 (2d Cir. 2022) (internal quotation marks and citation omitted). With this in mind, the court limits its rulings to those that can be reached without a complete factual record and the parties' briefing based thereon.

The court first considers whether Plaintiff spoke as a citizen or an employee. The Second Circuit has identified "two relevant inquiries to determine whether a public employee speaks as a citizen": (1) "whether the employee's speech falls outside of his official responsibilities"; and (2) "whether a civilian analogue to the employee's speech exists." *Shara*, 46 F.4th at 83 (internal quotation marks and citation omitted). The former is the "heart of [the] analysis" and constitutes an "objective, practical inquiry[,]" considering such factors as "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two," and "whether the plaintiff's speech was also conveyed to the public." *Id.* (internal quotation marks and citations omitted).

At the Jay Peak ski lodge, Plaintiff was not speaking "pursuant to government policy[]" or "to convey a government-created message[,]" *Kennedy*, 142 S. Ct. at 2424, however, his comment about "beating a boy pretending to be a girl" or "beating a biological boy" undoubtedly took place "within the office environment" because the comment was made in public to a group of student athletes and was thus effectively on "the field of play[.]" *Id.* at 2425 (internal quotation marks omitted). "[S]peech may be pursuant to an employee's official duties when it is part-and-parcel of the employee's concerns about his ability to properly execute his duties." *See Shara*, 46 F.4th at 83 (internal quotation marks and citations omitted).

The court's conclusion that Plaintiff's comment fell within his official responsibilities is buttressed by evidence that Plaintiff was "on the clock," in a position of authority, and was supervising his student athletes who could not leave the lodge without his permission at the time his speech occurred. *See Saxe*, 240 F.3d at 210 (observing that "speech may be more readily subject to restrictions when a school . . . audience is 'captive' and cannot avoid the objectionable speech[]"). His statements were directed at the circumstances of the competition and were meant to "encourag[e] better on-field performance[.]" *Kennedy*, 142 S. Ct. at 2424. The speech "at issue [was therefore] itself ordinarily within the scope of [his] duties.'" *Shara*, 46 F.4th at 83 (quoting *Montero v. City of Yonkers*, 890 F.3d 386, 397-98 (2d Cir. 2018)); s*ee also Weintraub v. Bd. of Educ*, 593 F.3d 196, 202 (2d Cir. 2010) ("[S]peech that government employers have not expressly required may still be pursuant to official duties, so long as the speech is in furtherance of such duties[.]") (internal quotation marks and citation omitted).

Because Plaintiff has not established that he spoke purely as a citizen rather than as an employee, he has not established an important component of his First Amendment claims. *See Heim v. Daniel*, 81 F.4th 212, 224 (2d Cir. 2023) ("Only where the speech at issue is so-called 'citizen speech' does a court then proceed, under *Pickering*, to determining whether the speech addressed a matter of public concern and, if so, to balancing the relevant employee and employer interests.") (quoting *Lane v. Franks*, 573 U.S. 228, 237 (2014)). Notwithstanding its conclusion that Plaintiff did not engage in purely "citizen speech," the court turns to whether Plaintiff's speech concerned a matter of public concern.

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks and citations omitted) (quotations omitted). Under this analysis, "a speaker's motive is not dispositive" and a speaker motivated "by a personal grievance" may still be speaking on a matter of public concern. *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir.

2009); *see also Pickering*, 391 U.S. at 572 (explaining that where teachers were "the members of the community most likely to have informed and definite opinions" on a topic of public debate, "it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal[]").

"Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement." *Specht*, 15 F.4th at 600. The Supreme Court has cautioned that "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

To evaluate a First Amendment challenge to a government policy that restricts employees' speech as citizens on matters of public concern, a court applies a "modified version of the *Pickering* balancing test[.]" *Lauretano v. Spada*, 339 F. Supp. 2d 391, 396 n.5 (D. Conn. 2004). To justify "a blanket policy designed to restrict expression by a large number of potential speakers[,]" "'the [g]overnment must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the [g]overnment.'" *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) (alteration adopted) (quoting *United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 468 (1995)). The potential harms on governmental operations must be "real, not merely conjectural," and the government must demonstrate that its regulation of employees' speech "will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475 (internal quotation marks and citation omitted). A court must accord "substantial weight" to the governmental entity's "reasonable predictions of disruption[.]" *Waters*, 511 U.S. at 673. Under this balancing test, "the distinction between facial and as-applied constitutional challenges becomes unimportant." *Harman*, 140 F.3d at 118.

Gender identity and the participation of transgender athletes in athletic competitions are matters of public concern and debate. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (determining "gender

identity" is a "sensitive political topic[]" and is "undoubtedly [a] matter[] of profound value and concern to the public") (internal quotation marks omitted). It does not become less of a matter of public concern and debate merely because this issue aligns with Plaintiff's private concerns, personal opinions, and religious beliefs as well. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 166 (2d Cir. 2006) ("[P]ersonal interests frequently induce speech that is nonetheless of public concern."). Plaintiff thus spoke as a school employee on a matter of public concern at a school function to students who were not free to leave without his permission. In doing so, he is alleged to have mocked or disparaged the gender identity of a transgender student on an opposing team.

The court must next consider "whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Matthews*, 779 F.3d at 172 (quoting *Lane*, 573 U.S. at 237). "[T]he government has the burden of showing that despite First Amendment rights the employee's speech so threatens the government's effective operation that discipline of the employee is justified." *Melzer v. Bd. of Educ.*, 336 F.3d 185, 193 (2d Cir. 2003). "[W]hen the government prevails in the balancing test, the employee may still carry the day if he can show that the employer's motivation for the discipline was retaliation for the speech itself, rather than for any resulting disruption." *Id.*

The parties dispute whether Plaintiff's speech had the effect of creating an objectively offensive environment as required by the policies. According to the credible testimony of Superintendent Sousa, based on Woodstock H.S.'s investigation, she would have terminated Plaintiff's employment even without a policy. The School Board Defendants advance persuasive arguments that Plaintiff's comments not only had the potential to disrupt a school function and cause offense to a captive audience but in fact did so. In contrast, Plaintiff has not yet sustained his burden of establishing his termination "was for the speech itself, rather than for any resulting disruption." *Melzer*, 336 F.3d at 193.

For purposes of the preliminary injunction, because Plaintiff has not established that his speech was protected by the First Amendment, he has not established a likelihood of success on the merits with regard to his First Amendment retaliation claim. By the same token, the School Board Defendants have not established they are entitled to dismissal of this claim. *See Cornelio*, 32 F.4th at 172 ("The dismissal of a claim challenging a law that abridges protected speech will rarely, if ever, be appropriate at the pleading stage. Instead, factual development will likely be indispensable to the assessment of whether [such a law] is constitutionally permissible.") (internal quotation marks and citation omitted) (alteration in original).

### D.   Whether Defendants Are Entitled to Dismissal of Plaintiff's Prior Restraint Claim.

Secretary Bouchey and Executive Director Nichols contend their respective challenged policies are not prior restraints on speech because they do not "g[i]ve public officials the power to deny use of a forum in advance of actual expression." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).[13] "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

The Second Circuit has defined a prior restraint as "'a law, regulation or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression.'" *Citizens United v. Schneiderman*, 882 F.3d 374, 386 (2d Cir. 2018) (quoting *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005)). The two traditional types of prior restraints are: (1) "preventing the printed publication of disfavored information[]"; and (2) "a facially-neutral law that sets up an administrative apparatus with the power and discretion to weed out disfavored expression before it

---

[13] The School Board Defendants move to dismiss Plaintiff's prior restraint claim but argue that the School's HHB Policy is a permissible regulation on school employee's speech and that it is not a prior restraint because the definition of "harassment" "is expressly tied to the objective impact on educational access." (Doc. 63 at 6.)

occurs[.]" *Id.* at 387. "[T]he presumption against prior restraint is best reserved for situations that closely resemble these two clear cases." *Id.*

The challenged policies in this case do not require pre-approval of speech nor do they prevent speech on identified subject matters before it occurs. *See Citizens United*, 882 F.3d at 387 (explaining that prior restraint claims have "the added element that the regulation prevents speech rather than merely burdening it[]"). Although the Verified Complaint alleges that the Model HHB Policy, the School's HHB Policy, and the VPA Policy are prior restraints because they "threaten future speech[,]" (Doc. 1 at 25, ¶ 203), the policies do not "deny use of a forum in advance of actual expression." *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (internal quotation marks and citation omitted). For this reason, Plaintiff has failed to state a plausible prior restraint claim and that claim is DISMISSED.

### E.     Whether Defendants are Entitled to Dismissal of Plaintiff's Claims under the First Amendment for Overbreadth and Vagueness.

Plaintiff challenges Defendants' policies on overbreadth and void for vagueness grounds because they allegedly sweep broader than necessary to serve their intended purpose and because of the vague language in the "purpose or effect" clause of the policies as well as the "intimidating[,] hostile, or offensive environment" language in the definition of "harassment[.]" (Doc. 1-11 at 5.)

"[I]mprecise laws can be attacked on their face under two different doctrines." *Morales*, 527 U.S. at 52. "First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)). "Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Id.*

### 1.   Whether the Policies Are Overbroad.

With regard to Plaintiff's overbreadth challenge, the court must first "construe the challenged statute[]" because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Adams v. Zenas Zelotes, Esq.*, 606 F.3d 34, 38 (2d Cir. 2010) (per curiam) (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). Next, "the challenging party 'must demonstrate from the text of the law and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally[.]'" *United States v. Thompson*, 896 F.3d 155, 163 (2d Cir. 2018) (alterations adopted) (quoting *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988)).

A law's overbreadth must be "substantial, not only in an absolute sense, but also relative to the [law's] plainly legitimate sweep." *Williams*, 553 U.S. at 292. "[T]he mere fact that one can conceive of some impermissible applications of a [policy] is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Instead, "there must be a realistic danger that the [policy] itself will significantly compromise recognized First Amendment protections of parties not before the [c]ourt for it to be facially challenged on overbreadth grounds." *Id.* at 801 (citations omitted). Without this showing by Plaintiff, his overbreadth challenge must fail and only a "case-by-case analysis" is required. *N.Y. State Club Ass'n, Inc.*, 487 U.S. at 14 & n.5 (citation omitted). "The overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort." *Id.* at 14 (quoting *Broadrick*, 413 U.S. at 613).

Plaintiff complains that the definition of "harassment" is not limited to "employment-related speech[,]" (Doc. 56 at 13) (internal quotation marks omitted), but applies to both on-duty and off-duty speech. The VPA Policy "prohibit[s] discrimination and/or harassment of students *on school property or at school functions by students or employees*." (Doc.1-14 at 4) (emphasis supplied). The Model HHB Policy and the School's HHB Policy do not contain this limitation.

Plaintiff further complains that the policies are "blanket polic[ies] designed to restrict expression by a large number of potential speakers[,]" including both students and employees, regardless of the tasks they are performing when the speech occurs. *Harman*, 140 F.3d at 118; *see also Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1217 (9th Cir. 1996) (finding overbreadth where policy "prevents free expression by employees, whenever they are in the workplace, even during lunch breaks, coffee breaks, and after-hours[]"). To justify such a policy, "'the [g]overnment must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the [g]overnment.'" *Id.* (quoting *NTEU*, 513 U.S. at 468).

More specifically, Plaintiff notes that the policies allow school officials to consider "all the facts and circumstances" without identifying or limiting what may be considered. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022) (concluding anti-harassment policy was "almost certainly unconstitutionally overbroad" where it prohibited a wide range of expression concerning certain characteristics, covered many forms of expression, employed a "totality of known circumstances" approach to determine whether speech "unreasonably alters another student's educational experience[,]" and potentially included failure to intervene to halt another student's speech as a violation ) (internal quotation marks omitted) (alterations adopted). As Plaintiff observes, the policies' definition of "harassment" includes speech that has a prohibited "purpose" even if the speech produces no impact. In this respect, the "purpose or effect" clause of the policies is not as limiting as Defendants suggest,[14] but rather allows school officials to consider the speaker's motive in deciding whether the policy has been violated. *See Saxe*, 240 F.3d at 210-11 (finding overbreadth concern where

---

[14] The policies speak in terms of "purpose *or* effect" and, contrary to Secretary Bouchey's argument, do not require the creation of "an objectively negative *educational* environment," (Doc. 65 at 8) (emphasis supplied), but require only an "objectively . . . offensive environment" regardless of where it takes place. (Doc. 1-11 at 5.)

policy "focus[ed] on the speaker's motive rather than the effect of speech on the learning environment[]").

Defendants argue that it is "well settled that K-12 schools, under certain circumstances, can regulate the content of student speech, including offensive speech, that would otherwise be protected if uttered or displayed by a member of the general public." *Radwan v. Manuel*, 55 F.4th 101, 115 (2d Cir. 2022) (citing *Fraser*, 478 U.S. at 682). They contend the Verified Complaint does not sufficiently allege the ways in which the policies sweep too broadly and thus Plaintiff has not sustained his "burden of demonstrating, 'from the text of [the policies] and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (citation omitted).

Plaintiff's Verified Complaint alleges that

> By defining "harassment" to include a single "incident" of "verbal" conduct motivated by any of numerous characteristics, including "gender identity," that has the [purpose or] effect of creating an "offensive environment," among other things, Defendants can punish a substantial amount of constitutionally protected speech.

(Doc. 1 at 26, ¶ 217.) He further contends that the policies "impose an overbroad restraint on speech made by employees as private citizens about matters of public concern[,]" *id.* at 27, ¶ 221, and that "Defendants have no interest that would outweigh the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression[,]" *id.* at ¶ 222. Although relatively bare bones, at the pleading stage, these allegations suffice to state an overbreadth challenge because Plaintiff has identified ways in which the policies may sweep in a substantial amount of protected speech for no countervailing educational purpose. In deciding a motion to dismiss, the court's task is not to weigh the evidence and determine whether the claim will succeed. *See Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017) (holding that, at the pleading stage, the court does not "weigh the evidence" nor "evaluate the likelihood" that a plaintiff's claims will prevail).

For the reasons stated above, Defendants' motions to dismiss Plaintiff's overbreadth challenge are DENIED. *See Cornelio*, 32 F.4th at 172 (observing that

dismissal of overbreadth challenge to law that allegedly abridges protected speech "will rarely, if ever, be appropriate at the pleading stage[]") (internal quotation marks omitted).

### 2.    Whether the Policies Are Impermissibly Vague.

Plaintiff gains less traction with his vagueness claim. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "Thus, all vagueness challenges—whether facial or as-applied—require [a court] to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006). Statutes are vague if they require "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306. "[M]athematical certainty" is not required. *Hill*, 530 U.S. at 733 (citation omitted).

As Defendants point out, the level of precision required for a policy or statute to survive a vagueness challenge depends on the circumstances in which the policy or statute applies. "[A] public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Waters*, 511 U.S. at 673. "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686. "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Although Plaintiff contends "gender identity" is entirely subjective, "gender identity" is defined by Vermont law to mean "an individual's actual or perceived gender identity, or gender-related characteristics intrinsically related to an individual's gender or gender-identity, regardless of the individual's assigned sex at birth." 1 V.S.A. § 144. "'[G]ender identity' ha[s] [a] common meaning[] that [is] clear to a reasonable person[.]"

45

*Tingley v. Ferguson*, 47 F.4th 1055, 1090 (9th Cir. 2022); *see also Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 842-44 (S.D. Ind. 2020) (dismissing void for vagueness challenge to school policy requiring teachers to use students' chosen first names and pronouns in which the plaintiff argued terms like "gender discrimination" are subjective, and noting plaintiff's claims based on his religious beliefs demonstrated his understanding of what was prohibited).

The term "harassment" is not only defined by the challenged policies, a separate section of it "includes" "epithets, stereotypes, slurs, comments, insults, derogatory remarks, gestures, threats, graffiti, . . . and negative references[.]" (Doc. 1-11 at 5.) This non-exhaustive list does not broaden the definition of "harassment" but merely provides examples of the type of speech and conduct that may be prohibited. To the extent Plaintiff argues the policies' use of the term "includes" creates a list of "*nonexclusive* criteria" that Defendants could use to "camouflage [their] discriminatory use of the [policies] through post-hoc reliance on unspecified criteria" beyond those described in the primary definition of "harassment," *Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 104 (2d Cir. 2007) (emphasis in original), that is arguably more an issue of overbreadth than vagueness. The policies require the speaker to have the "purpose or effect of objectively and substantially undermining and detracting from" certain defined educational objectives or the creation of an "objectively intimidating, hostile, or offensive environment." 16 V.S.A. § 11(a)(26)(A); *see also Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 356 (8th Cir. 2020) (concluding "objective" component of "sexual harassment" definition in university's policy required reasonable person analysis and contributed to "adequate notice").

Because the challenged policies contain defined terms, because they provide adequate notice regarding what is prohibited, and because they contain an objective standard, Plaintiff has not plausibly alleged a vagueness claim. That challenge is therefore DISMISSED.

F.    **Whether Plaintiff's As-Applied and Facial Claims for Content and Viewpoint Discrimination Must be Dismissed.**

Plaintiff alleges that Defendants' policies are a form of content and viewpoint discrimination because they target speech that Defendants deem offensive and provide school administrators with unbridled discretion in making this determination. He points out that the Supreme Court has ruled that a prohibition on "disparagement" is viewpoint-based. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2298-99 (2019) (ruling that a "ban on registering [trade]marks that 'disparage' any 'person[], living or dead[,]'" is "viewpoint-based[]") (second alteration in original); *see also Saxe*, 240 F.3d at 260 (observing that "a disparaging comment directed at an individual's sex, race, or some other personal characteristic has the potential to create a[] 'hostile environment' . . . precisely because of . . . the odious viewpoint it expresses[]").

Defendants argue that their respective policies are content neutral because they target the secondary effects of speech rather than the content of speech. Policies that target "secondary effects" of speech "serve[] purposes unrelated to the content of expression[.]" *Mastrovincenzo*, 435 F.3d at 98 (quoting *Ward*, 491 U.S. at 791).

Generally, content-based policies must satisfy strict scrutiny, *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (stating content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests[]"), while content-neutral policies need only satisfy intermediate scrutiny, *see Clementine Co. v. Adams*, 74 F.4th 77, 87 (2d Cir. 2023) (explaining content-neutral regulations must "(1) 'advance[] important governmental interests unrelated to the suppression of free speech' and (2) ' . . . not burden substantially more speech than necessary to further those interests[]'") (quoting *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 155 (2d Cir. 2013)). The court need not and does not determine what level of scrutiny applies at this time because there are competing views of the policies' proper interpretation and a dispute as to what level of scrutiny applies in the facts and circumstances of this case. The court thus confines its ruling to whether Plaintiff has stated a plausible claim for relief.

"Content-based regulations 'target speech based on its communicative content.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Reed*, 576 U.S. at 163). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Reed*, 576 U.S. at 163.

"The principal inquiry in determining whether a regulation is content-based or content-neutral 'is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys.'" *Clementine Co.*, 74 F.4th at 87 (quoting *Time Warner Cable Inc.*, 729 F.3d at 155). "In determining whether a regulation is content based or content neutral, [a court therefore] look[s] to the purpose behind the regulation[.]" *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) (citation omitted).

"Viewpoint discrimination is a 'subset or particular instance of the more general phenomenon of content discrimination,' in which 'the government targets not subject matter but particular views taken by speakers on a subject[.]'" *Make The Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 150 (2d Cir. 2004) (citation omitted) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 831 (1995)). It is "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829.

The Supreme Court has ruled that "[g]iving offense is a viewpoint[,]" and therefore a prohibition on "disparagement" is viewpoint discrimination, even though it "applies equally" to groups on opposing sides of debates. *Matal v. Tam*, 582 U.S. 218, 243 (2017). Citing *Matal*, the Second Circuit has held offensive speech, such as ethnic slurs, may be the target of government regulation without being viewpoint discrimination if the purpose is to prevent the negative effects of such speech beyond "mere offense[.]" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) (internal quotation marks omitted). As an example, the Second Circuit cited anti-discrimination employment laws that target the immediate harms that unlawful discrimination inflicts. *Id.*

The definition of "harassment" in the policies requires the speech in question to be "based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status[,] disability, sex, sexual orientation, or gender identity[.]" (Doc. 1-11 at 4-5.) It is not prohibited to discuss these subject matters, it is prohibited to discuss them in a certain manner. The policies' application thus appears to turn on "the content of the regulated speech[.]" *Reed*, 576 U.S. at 164. [15]

In examining the "purpose behind the regulation," *Bartnicki*, 532 U.S. at 526, the Vermont Legislature imposed a requirement to create a Model HHB Policy and chose a statutory definition of "harassment," 16 V.S.A. § 11(a)(26), to reflect "the policy of the State of Vermont that all Vermont educational institutions provide safe, orderly, civil, and positive learning environments. Harassment, hazing, and bullying have no place and will not be tolerated in Vermont schools." *Id.* § 570(a). This is the governmental purpose underpinning the policies and the reason for their existence. *See Clementine Co.*, 74 F.4th at 87 (stating "[t]he principal inquiry in determining whether a regulation is content-based or content-neutral 'is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys[]'") (citations omitted).

Although certain portions of the policies focus on the *impact* of the speech as opposed to the "mere offense" given to a particular individual, *Wandering Dago, Inc.*, 879 F.2d at 32 (internal quotation marks omitted), Plaintiff has pointed out that in addition to the *impact* of the speech, the policies target speech that has a prohibited "purpose" even if no impact takes place. They also target speech that creates an "objectively . . . offensive environment," (Doc. 1-11 at 5) regardless of the impact on a school's educational mission.

---

[15] Both the parties and the court draw a distinction between a brief, semi-private, and respectful conversation with two students during a break in the competition and a public rallying cry to "beat" a specific transgender athlete who was "pretending to be a girl" with the implication that this rendered the competition unfair. In this respect, the policies require examination of the content of the speech.

Because Plaintiff has plausibly pled that the challenged policies are content based, Defendants' motions to dismiss Plaintiff's claims of content and viewpoint discrimination are DENIED.

### G.    Whether the Balance of Hardships and the Public Interest Favor Injunctive Relief.

Plaintiff asserts that the balance of hardships and the public interest tip in his favor because securing First Amendment rights is in the public interest and because Defendants, as government officials, do not have an interest in enforcing unconstitutional policies.

Defendants argue Plaintiff's requested injunction would be contrary to the public interest and would permit Plaintiff, and others, to disparage the gender identity of students and their family members with impunity. They assert it would harm transgender athletes, putting them at risk of serious mental health issues, while undermining Vermont anti-discrimination and public accommodation laws. They characterize Plaintiff's harm as overstated because he was an at-will employee with no right to continued employment who fully understood that disparaging and mocking a student's gender identity was prohibited by Woodstock H.S.

"Where the [g]overnment is the opposing party, the final two factors in the [preliminary injunction] analysis—the balance of the equities and the public interest— merge." *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020). For this reason, a plaintiff "seek[ing] to enjoin the activity of a government agency[] . . . must contend with the well-established rule that the [g]overnment has traditionally been granted the widest latitude in the dispatch of its own internal affairs[.]" *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (internal quotation marks omitted).

Although "securing First Amendment rights is in the public interest[,]" *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), Plaintiff has not established that he is likely to succeed on the merits of his First Amendment claims. Moreover, he requests relief that would sweep far broader than his personal circumstances. *See A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 279 F. Supp. 2d 341,

349 n.19 (S.D.N.Y. 2003) ("A preliminary injunction should sweep only so far as necessary to protect the legitimate interests of the plaintiff.").

In contrast, Defendants have identified important educational goals consistent with Vermont anti-discrimination and public accommodation laws that would be undermined if their HHB policies were struck down before a factual record is developed and before adequate legal briefing takes place. On balance, the balance of hardships and the public interest weigh in favor of Defendants and against Plaintiff based on the record before the court.

Because Plaintiff has not established his entitlement to the "extraordinary remedy" of preliminary injunctive relief, *Winter*, 555 U.S. at 24, his motion for a preliminary injunction is DENIED.

## CONCLUSION

The court GRANTS IN PART and DENIES IN PART the motions to dismiss of Secretary Bouchey, (Doc. 29) the School Board Defendants, (Doc. 34) and Executive Director Nichols, (Doc. 37). Plaintiff's motion for a preliminary injunction is DENIED. (Doc. 2.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 28th day of December, 2023.

Christina Reiss, District Judge
United States District Court